[No. E042038. Fourth Dist., Div. Two. Jan. 23, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH DEMARIO WILLIAMS, Defendant and Appellant.

588

594

**COUNSEL**

Sally P. Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Kyle Niki Shaffer and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

**O**PINION

**HOLLENHORST, J.**—

## I. INTRODUCTION

Defendant Kenneth Demario Williams appeals from his conviction of: possession of a firearm by a felon (Pen. Code, § 12021, subd. (a)(1)—count 1); possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)—a lesser offense in count 2); possession of a controlled substance while armed (Health & Saf. Code, § 11370.1—count 3); possession of ammunition by a felon (Pen. Code, § 12316, subd. (b)(1)—count 4); and participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)—count 5), along with the true findings on allegations as to counts 2 through 4 that defendant committed the crimes for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)).[1]

Although framed under a variety of headings—trial court abuse of discretion, trial court misconduct, and prosecutorial misconduct—defendant's principal argument is that it was error to admit evidence about dozens of contacts defendant and fellow gang members had with law enforcement, regardless of whether those contacts had led to convictions or even to arrests, and regardless of whether the evidence had any reliable basis. Although we find plain error in the admission of such unnecessary quantities of evidence, which turned the trial of this routine drug and weapons possession case into a weeks-long marathon, we nonetheless find the error harmless because the case against defendant was overwhelming.

Defendant also contends (1) the trial court erred by permitting expert witnesses to give opinions on the ultimate issues; (2) the trial court committed other misconduct; (3) the evidence was insufficient to support defendant's conviction because a police officer testified that any one of the seven persons present in the house where the contraband was found could have possessed the guns and drugs; (4) misdemeanor assault was erroneously identified to the jury as a predicate offense to support the gang charge and enhancement allegations; (5) the trial court erred in instructing the jury that the specific intent for the gang enhancement was to promote *any* criminal conduct; (6) the trial court erred in failing to instruct the jury sua sponte on the definition of the term "principal"; (7) the prosecutor committed misconduct; (8) the upper term for the gang enhancement allegation in count 3 violated defendant's Sixth Amendment right to a jury trial; (9) other sentencing errors occurred; and (10) cumulative errors resulted in a fundamentally unfair trial.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

The People concede one sentencing error must be corrected, and we conclude additional sentencing errors must likewise be corrected. We find that any other errors that occurred, whether considered individually or cumulatively, were not prejudicial, and we affirm.

## II. FACTS AND PROCEDURAL BACKGROUND

### A. *Evidence Relating to Current Charges*

On February 16, 2006, Palm Springs Police Department officers went to an address on Avenida Cerca (the Avenida Cerca house or the Avenida Cerca address) to arrest Dimitri Allen on an outstanding warrant. Allen, who had been standing on the front porch of the house when the officers arrived, went inside and closed the door after the officers identified themselves and ordered him to the ground. The officers called for backup and set up a perimeter.

Sergeant Bryan Anderson knocked on the door. Defendant eventually opened the interior door but left the security screen locked. The officers told defendant they were there to serve the arrest warrant on Allen, but defendant refused to let the police enter. In a two- to three-minute conversation, defendant told the officers several times that they had no right to enter his house and that he had been working on the computer in his bedroom. Defendant was visible to the police the entire time, and the officers could hear other persons moving around inside the house. Eventually, defendant allowed the officers to enter the house.

Defendant and six other men—Allen, Tracy Session,[2] Christopher Manning, Bobby Shaw, Trevon Smith, and Damion Lee[3]—exited the house. All the men except Shaw were members of the Gateway Posse Crips (GPC) gang, and Shaw was an associate of that gang. A woman, Michelle Booty, was outside the house beside a car.

The officers searched the house. In the northeast bedroom, they found a laptop computer and two cell phones on a bed. A loaded nine-millimeter handgun was under a pillow on the bed. In that bedroom, the officers also found a drug pipe, two digital scales, and mail addressed to defendant at the Avenida Cerca and other addresses. The officers also found defendant's driver's license and California identification card in the bedroom; both pieces of identification had the Avenida Cerca address on them. A box of .44 magnum ammunition and a box of nine-millimeter ammunition were found on the dresser and a box of .44 Winchester ammunition was found in a Louis

---

[2] Sometimes referred to in the record as Tracy Sessions.
[3] Sometimes referred to in the record as Damian Lee.

Vuitton bag in the bedroom closet. The closet contained men's clothing consistent with defendant's size. A ball cap found in the bedroom bore defendant's moniker, "Swif."[4]

In the garage, approximately 11 to 15 feet from the bedroom, the officers found a duffel bag that contained 11 baggies of methamphetamine and a revolver with the word "Crip" etched on it. It was stipulated that one baggie contained 3.3 grams of methamphetamine, and each of the 10 smaller baggies contained 0.5 grams of methamphetamine.

The officers arrested all seven men who had been in the house for possession of guns and methamphetamine. Defendant, who was unemployed, had $776.98 in his possession. Manning had $0.35 on him; Shaw had $73.01; Smith had $72.40, and Session had $17.76.

Sergeant Matthew Beard testified at trial that the guns, ammunition, and drugs belonged to defendant. At the preliminary hearing, Sergeant Beard had testified that all those in the house had access to the drugs and firearms.

Sergeant Anderson testified as an expert on methamphetamine and drug sales. He testified that 0.5 grams of methamphetamine were a usable quantity worth $25 to $40, and 3.3 grams of methamphetamine were worth $120 to $180. In his opinion, the methamphetamine was possessed for sale. That opinion was based in part on the amount of methamphetamine and the manner in which it was packaged, as well as the presence of the scales and cell phones. That opinion was also based on evidence of other crimes admitted under Evidence Code section 1101, subdivision (b), further discussed below, and on a search conducted at defendant's home in December 1989. At the time of the 1989 search, defendant had been living with a relative, Kenneth Crawford, who was a member of a predecessor gang to the GPC. During that search, the officers had found one or two sawed-off shotguns, a handgun, and drug paraphernalia. Another person in the house had drugs on his person. Defendant was arrested in that incident for maintaining a drug house, and he received diversion. Sergeant Anderson also testified he would have formed the opinion that the methamphetamine was possessed for sale even without considering defendant's prior conduct.

Sergeant Anderson further stated his opinion that defendant had worked his way up from being a street-level drug seller or runner to his present position in which others sold drugs for him. The basis for that opinion included a police report stating that in February 1988, an officer had seen defendant on a street corner tossing a rock of cocaine. A fight had ensued when the officer had tried to arrest defendant, and defendant had escaped but had later turned himself in.

---

[4] Other evidence indicated his moniker was "Big Swif."

B. *Evidence of Defendant's Other Crimes and Arrests*

Before trial, the trial court ruled the prosecutor could introduce evidence under Evidence Code section 1101, subdivision (b), of three prior crimes involving defendant. At trial, the prosecutor produced evidence of those crimes, as follows.

(1) In December 1991, officers searched defendant's home and found two handguns, a rifle, a submachine gun, a shotgun with a pistol stock, a high-powered rifle, ammunition, $1,277 in cash, baggies, pay/owe sheets, and four pieces of rock cocaine. Defendant had another $360 on his person. Defendant was convicted in 1993 for possessing a controlled substance. (Health & Saf. Code, § 11351.5.) At the time of his arrest, he said he supported himself and his girlfriend and children by selling rock cocaine, and the money found was from such sales. He told the officers he was a member of the GPC, he had several drug runners working for him, and he needed the guns because he was a gang member selling rock cocaine.

(2) In January 1992, a police officer saw defendant and two GPC members standing near a parked car. When the officer approached, defendant twice reached into his waistband and each time placed an object into the trunk of the parked car. The officers conducted a consensual search of the car and found two pagers and a loaded pistol. Defendant admitted ownership of the pagers and the pistol. The officers arrested defendant for having a concealed firearm and found $1,428 in cash in his pocket. Sergeant Anderson testified that at the time, drug dealers and buyers communicated with pagers.

(3) In April 2003, pursuant to a search warrant, police officers searched Session's house, where defendant was then living. Defendant, Session, and another GPC member were present during the search. The officers found a modified shotgun in defendant's bedroom, and he was carrying $2,874 in his pocket. The officers found a revolver and marijuana in Session's room, and a scale, a revolver, marijuana, and $1,000 in counterfeit money in the garage.

The prosecutor also introduced evidence of the following crimes and contacts with law enforcement.[5]

(1) In 1988, unspecified members of the GPC were arrested for robberies of students at the high school defendant attended.

---

[5] Some of the crimes and incidents were introduced multiple times and for multiple purposes, including (1) under Evidence Code section 1101, subdivision (b), (2) as predicate crimes for the gang enhancements and substantive gang crime, and (3) as the basis for expert opinion testimony.

(2) In February 1988, defendant, who was then a juvenile, allegedly discarded cocaine and fought with officers on a street corner.

(3) In June 1988, defendant purportedly threatened to kill a teacher at his high school.

(4) While in high school, defendant purportedly shoplifted clothing.

(5) In July 1990, defendant was arrested for a home invasion robbery at the home of Norman Gant. Defendant was accused of possessing a firearm and purportedly told the police he was selling drugs. The records of the case were destroyed.

(6) In September 1991, defendant was arrested for assaulting Tyler Hamm with a deadly weapon. Defendant was not convicted.

(7) In March 1992, defendant was arrested for an unspecified offense with another GPC member.

(8) In July 1999, defendant was involved in a traffic collision.

(9) Defendant coached his son's football team, purportedly in violation of his probation.

(10) In November 2000, defendant broke up a riot at Session's house. Defendant was not arrested or convicted.

(11) In October 2002, defendant received a traffic ticket.

(12) In January 2003, defendant drove around the neighborhood stopping his car to talk to drug runners.

(13) In June 2001, defendant was arrested for and later convicted of misdemeanor battery on an umpire.

(14) In April 2004, a police report stated defendant had been in the presence of other gang members at a nightclub. Defendant was not arrested or convicted.

(15) In April 2004, defendant broke up a fight at a Denny's restaurant. The police claimed defendant possessed stolen property. Defendant was not arrested or convicted.

## C. *Gang Evidence*

Palm Springs Police Detective William Judd testified as a gang expert. He testified that the GPC originated in 1988, and defendant, whose moniker is "Big Swif," was one of the founding members. The GPC operates in the northern part of Palm Springs and Desert Hot Springs and has more than 100 members who use common signs and symbols. Detective Judd testified the GPC's primary activities are drug sales, prostitution, and strong-arm robberies, and its members have also committed murder, kidnapping, grand theft auto, robbery, arson, and extortion.

Detective Judd had first met defendant during the 1986–1987 school year when the detective had been a campus police officer at defendant's high school. The next year, Detective Judd became aware of defendant's membership in the GPC when defendant and other students began bragging about it. Defendant distributed blue flannel shirts (blue was the GPC color) to fellow gang members at a football game and referred to the Crips in June 1988, when he threatened to shoot a teacher.

Detective Judd testified that defendant had GPC-related tattoos on his stomach and forearms, including a "RIP Tiny Crazo" tattoo on one forearm. GPC member Tiny Crazo died in early 2003.

Detective Judd identified defendant in GPC-related photographs from the early 1990's. The detective testified that defendant's name at the top of a gang roster indicated defendant's leadership position. Defendant had admitted gang membership when he was arrested in the late 1980's and again in the late 1990's. Defendant also had admitted his gang membership during a traffic stop in January 2006 and when he was being booked in the present case.

Two letters found during the search of the Avenida Cerca house were addressed to defendant as "Big Swif" and were from GPC member James Murrell, also known as "Little Swif." The letters were dated in August and September 2005. Murrell was in prison, and in the letters he asked what was happening in the gang's turf and asked about another GPC member. Detective Judd testified that he believed the language used in one letter indicated defendant was still an active participant in the gang.

Detective Judd further testified that defendant had frequently been seen in the company of other GPC members. In July 1990, defendant had been arrested for a robbery with two GPC members. In January 2003, Detective Judd had seen defendant stop at different street corners and talk to people whom Detective Judd believed were defendant's drug runners. Also in 2003,

defendant had paid the towing bill for a GPC associate whom Detective Judd believed was defendant's drug business employee. Defendant had been with another GPC member when he had paid that bill.

Detective Judd stated his opinion, based on defendant's police contacts, criminal activity, and admissions, that defendant was an active participant in the GPC from 1988 through 1999. In Detective Judd's opinion, based on observations of defendant with other GPC members, the leadership position defendant took in calming people during the 2000 arrest of another GPC member, defendant's "RIP Tiny Crazo" tattoo, and his 2003 arrest with other GPC members, defendant's active participation in the GPC continued from 2000 through 2006. Detective Judd believed defendant was a leader in the gang and also ran the gang's drug trade.

Detective Judd testified that on the day of the search of the Avenida Cerca house, defendant had tried to harbor Allen when the police arrived. Detective Judd believed the gang had been meeting about the recent gang-related murder of a GPC member. Detective Judd testified the GPC had been known to retaliate for violence against its members, and it was "quite possible . . . they were preparing for some sort of retaliation." Detective Judd believed defendant had acted on behalf of the GPC by providing a place for the meeting, by having weapons available to protect the drugs and the gang's territory, and by trying to intimidate or delay the officers at the front door of the house.

Detective Judd stated his opinion that the methamphetamine found in the garage was possessed for the benefit of the gang and was possessed for sale. He opined that the firearms and ammunition were possessed for the benefit of the gang to protect the gang's turf and members. Detective Judd testified that in his opinion, it was possible the methamphetamine belonged to defendant alone, because defendant was running the drug trade for the GPC. Detective Judd did not believe the other GPC members would have been able to sell the methamphetamine from the house without defendant's knowledge or permission.

The prosecutor introduced evidence of the following predicate crimes to establish the gang allegations and substantive gang offense.

(1) On August 10, 2001, four GPC members committed a robbery during which one GPC member fatally shot a drug buyer. Detective Judd believed the crime was gang related because all four participants were GPC members, and the shooter had fired when one of the gang's leaders had directed him to do so.

(2) On December 2, 2002, GPC members beat a man and smashed his face with a boulder. Defendant was not involved. Detective Judd believed the

crime was gang related because three GPC members participated together and because the victim had confronted them on their turf.

(3) In 2003, a GPC member was convicted of robbery based on an incident in which he had stuck a lit cigarette in the crotch of and took money from an undercover officer who had argued with the member over the quality of drugs the member was selling in an undercover buy program.

(4) In 2003, during the same undercover buy program, three other GPC members and a GPC associate sold cocaine to undercover operatives.

(5) On April 11, 2004, 10 to 15 GPC members were involved in a fight at a Denny's restaurant in an area the gang claimed as its turf. A nongang member was beaten almost to death, and GPC members stole his wallet and cell phone. Defendant was present but not involved in the fight. Detective Judd believed the incident was gang related because GPC members were making a statement about their turf.

(6) After the fight at Denny's, officers called the cell phone of the victim, and the person who answered the phone agreed to return the phone and the victim's wallet for a reward. Officers stopped defendant and GPC member Manning in a car en route to collect the reward. Defendant gave the wallet and phone to the police. Manning was convicted of receiving stolen property; defendant was not charged. An officer had seen defendant at a nightclub earlier that evening with two GPC members, one of whom was later convicted of assault based on the beating at Denny's.

(7) On July 7, 2005, a GPC member offered a $20 reward to the first junior member of the gang who could knock a 13-year-old boy unconscious. Detective Judd believed the crime was gang related because the victim had earlier been involved in a physical altercation with a GPC member. Certified court documents in San Bernardino County Superior Court case No. INF051266 showed that one GPC member had been convicted of aggravated assault.

(8) In addition, defendant's 1993 conviction of possession for sale of a controlled substance (Health & Saf. Code, § 11351.5) was designated a predicate offense.

### D. *Defense Evidence*

Defendant testified in his own behalf. He testified that on February 16, 2006, he had been living with his girlfriend, Latasha Strange, and their children on North Sunrise. He was visiting his aunt's house at the Avenida

Cerca address that day, preparing to leave for a friend's funeral in Texas. Allen, Session, Shaw, Lee, Manning, defendant's brother Brandon Williams, and Michelle Booty were also at the aunt's house. Booty and Session were defendant's cousins; Allen, Shaw, and Lee were defendant's childhood friends.

Defendant admitted he had been one of the original members of the GPC, having joined in 1988 when he was 18. He had been a well-respected member and a "shot caller." He also admitted he had sold drugs from 1988 through 1993. He had used the profits from selling drugs to support his family, and he did not share the profits with the gang. He denied he had ever used runners to sell drugs.

Defendant testified he quit the gang in 1994 and had stopped selling drugs after 1997. He was not currently an active member of the gang. He testified that he had the gang tattoo put on his stomach in 1992 and had gang tattoos put on his arm in 1988 and 1990. He admitted a prior felony conviction for possession of cocaine for sale, a prior felony conviction for possession of a firearm by a felon, and a misdemeanor conviction for battery.

Defendant denied ownership of the guns, drugs, ammunition, and drug pipe found at the Avenida Cerca house. Defendant admitted he had possessed drugs when the police stopped him at a street corner in February 1988, but denied he had been selling drugs. He denied that he had maintained a drug house in 1989, and he testified that those charges had been dropped. He similarly denied involvement in other crimes. He explained that he had obtained the cash he was carrying on February 16, 2006, from Strange, a tax return, his aunts, and another person. The money was to pay for his car registration and his trip to the funeral in Texas.

Defendant's aunt, Gwen Crawford, testified she had lived at the Avenida Cerca house for 18 years, and defendant had stayed there "quite a bit." Defendant kept clothes and received mail there. He used the bedroom where the computer had been found. Others also had stayed at that house and had used that room. Two people had been living in her garage for the past couple of years. Crawford did not allow drugs or firearms in her house. On the afternoon of February 16, 2006, a friend had picked up Crawford at the Avenida Cerca house. When she left, defendant, Smith, and Booty were at the house, but Crawford did not remember any of the other men being there. Defendant had been preparing to go to his best friend's funeral in Texas. Crawford testified that she and her friend had given defendant money that day for his trip. She testified the Louis Vuitton bag containing ammunition that the officers had found in the bedroom closet resembled a bag that defendant owned.

### E. *Rebuttal Evidence*

The manager of Strange's apartment complex testified she had occasionally seen defendant there in 2002 and had last seen him there in 2003. The manager testified she would have known if defendant had been living with Strange in February 2006, and he had not been living there.

A deputy who completed classification forms for defendant at the jail in February 2006 testified that defendant had told the deputy defendant was affiliated with the GPC, his moniker was "Big Swif," and he had a tattoo saying "Gateway Posse" on his right arm and another tattoo saying "GWPC" on his stomach. Defendant certified with his signature that those statements were true. The purpose of asking inmates about their gang affiliation was to protect the inmates by ensuring they were not housed with members of rival gangs.

Another deputy testified that defendant had made similar statements in June 2006 concerning his gang affiliation, moniker, and tattoos. Defendant told that deputy his rival gangs were Tre 9 and the Bloods. Defendant had again signed a form certifying the statements were true.

An investigator with the district attorney's office testified he knew defendant and had reviewed the jail classification notes. In the investigator's opinion, defendant was a current member of the GPC. That opinion was based on the fact that other GPC members had asked to be transferred to defendant's tank after his arrest—defendant was a founder and leader of the GPC, and other incarcerated members would want to be in his tank for mutual protection and to discuss and continue gang activity. In addition, defendant had been identified as a GPC member on a field identification card completed in January 2006 when defendant was stopped for a traffic violation, and the address listed for defendant on the card was the Avenida Cerca address. Defendant had approached the investigator about becoming an informant after defendant was arrested in this case. The investigator's opinion was also based on defendant's reputation throughout the Coachella Valley and the fact that defendant had identified himself as being affiliated with the GPC.

Sergeant Donald Fallon testified that in July 1990, in investigating the home invasion robbery of Norman Gant, he had contacted possible suspects, including defendant. Defendant had admitted going to the victim's house armed with a firearm in the company of two other GPC members. Defendant had armed himself in advance because he anticipated a possible shootout. Defendant had intended to tell the victim to stop selling drugs because the victim "was cutting into their business." Defendant had denied taking any money during the robbery. Sergeant Fallon did not know if defendant was

convicted in the case. Defendant's aunt, Gwen Crawford, had been arrested for harboring a fugitive, but she was not convicted.

### F. Jury Verdicts and Sentence

The jury found defendant guilty of possession of a firearm by a felon (Pen. Code, § 12021, subd. (a)(1)—count 1); possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)—a lesser offense in count 2); possession of a controlled substance while armed (Health & Saf. Code, § 11370.1—count 3); possession of ammunition by a felon (Pen. Code, § 12316, subd. (b)(1)—count 4); and participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)—count 5). The jury found true the allegations as to counts 2 through 4 that defendant committed the crimes for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)), but found the same allegation not true as to count 1. In bifurcated proceedings, defendant stipulated that he had suffered a conviction in 1993 for a violation of Health and Safety Code section 11351.5.

The trial court sentenced defendant to 10 years in prison, consisting of the upper term of four years for count 3, a consecutive upper term of four years for the gang allegation as to that count, a consecutive term of eight months for count 4, and a consecutive term of one year four months for the gang allegation as to that count. The trial court imposed concurrent terms for counts 1 and 5 and stayed the sentence for count 2 under section 654.

## III. DISCUSSION

### A. Admission of Gang Evidence and Evidence of Prior Arrests

Defendant contends the trial court erred in admitting inflammatory, speculative, and cumulative evidence of numerous uncharged crimes, as well as arrests of defendant and other alleged gang members that did not result in convictions, and in permitting witnesses to testify as gang experts without a proper foundation.[6] In overlapping arguments, he contends the trial court erred in admitting prejudicial evidence of numerous uncharged crimes, and he contends the prosecutor committed misconduct by introducing the same evidence.

---

[6] Defendant refers to a number of incidents in addition to those set forth in the statement of facts as the bases for his contentions on appeal. The pages of the reporter's transcript to which defendant has cited do not indicate that evidence of such incidents was presented at his trial. Rather, the incidents appear to have been raised in pretrial discussions. In the absence of citations to the record showing that the jury heard such evidence, we will not further discuss or consider those additional incidents.

### 1. Additional Background

Before trial, the prosecutor, Deputy District Attorney Rosalind Miller, moved to admit evidence of uncharged offenses under Evidence Code section 1101, subdivision (b). The trial court conducted a hearing under Evidence Code section 402, at which defendant stipulated to the admission of an April 2003 incident during which the police searched a house where defendant and two other gang members were present, and where the police found guns, marijuana, and a scale, and defendant had $2,874 in cash in his pocket. Over the objection of defense counsel, Deputy Public Defender Brenda Miller, the trial court ruled two other incidents were admissible: A January 1992 incident in which the police found guns and pagers in the trunk of a car and a December 1991 home search in which the police found rock cocaine, pay/owe sheets, guns, and a large amount of cash. The trial court ruled the other offenses were inadmissible under Evidence Code section 1101, subdivision (b). However, the trial court repeatedly stated that such offenses might come in anyway as predicate crimes. At trial, the prosecutor introduced evidence of numerous prior uncharged offenses as set forth above in the statement of facts.

### 2. Standard of Review

The trial court has great discretion in determining the admissibility of evidence, and on appeal, we find reversible error if the trial court's exercise of its discretion was arbitrary, capricious, or patently absurd resulting in a manifest miscarriage of justice. (*People v. Ochoa* (2001) 26 Cal.4th 398, 437–438 [110 Cal.Rptr.2d 324, 28 P.3d 78], abrogated on another point as stated in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

### 3. Forfeiture

The People argue that defendant failed to timely object in the trial court to some of the evidence about which he now complains and has therefore forfeited his objections. Defendant did raise numerous appropriate and timely objections in the trial court. Because of the sheer volume of prior crimes evidence admitted, our analysis of the issue would not change even if we presumed forfeiture as to some subset of that evidence. We will therefore exercise our discretion to address the issues on the merits. (See *People v. Bradford* (2007) 154 Cal.App.4th 1390, 1411 [65 Cal.Rptr.3d 548].)

4. *Analysis*

a. *Evidence admitted under Evidence Code section 1101, subdivision (b)*

■ As a general rule, evidence the defendant has committed crimes other than those for which he is on trial is inadmissible to prove bad character, predisposition to criminality, or the defendant's conduct on a specific occasion. (*People v. Avila* (2006) 38 Cal.4th 491, 586 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) However, Evidence Code section 1101, subdivision (b), permits evidence of a defendant's past criminal acts when relevant to prove a material fact at issue, such as identity, motive, or knowledge. (*People v. Roldan* (2005) 35 Cal.4th 646, 705 [27 Cal.Rptr.3d 360, 110 P.3d 289], overruled on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].) In prosecutions for drug offenses, evidence of prior drug use and prior drug convictions is generally admissible under Evidence Code section 1101, subdivision (b), to establish that the drugs were possessed for sale rather than for personal use and to prove knowledge of the narcotic nature of the drugs. (*People v. Pijal* (1973) 33 Cal.App.3d 682, 691 [109 Cal.Rptr. 230].)

Here, the trial court allowed the prosecutor to introduce evidence of three prior incidents under Evidence Code section 1101, subdivision (b). Those three incidents, as detailed in the statement of facts, were relevant to establishing defendant's knowledge, among other things. (*People v. Roldan, supra*, 35 Cal.4th at p. 705.) We conclude there was no abuse of discretion in the admission of the three incidents under Evidence Code section 1101, subdivision (b).

Moreover, the trial court instructed the jury on the limited purposes for which the evidence of the December 1991, January 1992, and April 2003 offenses introduced under Evidence Code section 1101, subdivision (b) could be used. We presume the jury understood and followed those instructions. (See *People v. Danielson* (1992) 3 Cal.4th 691, 722 [13 Cal.Rptr.2d 1, 838 P.2d 729], overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].)

b. *Evidence admitted for impeachment*

■ Other evidence defendant challenges was properly admitted for impeachment. First, evidence of defendant's two prior felony convictions was properly admissible for that purpose. In *People v. Wheeler* (1992) 4 Cal.4th 284 [14 Cal.Rptr.2d 418, 841 P.2d 938], superseded by statute on other grounds as stated in *People v. Duran* (2002) 97 Cal.App.4th 1448, 1459 [119 Cal.Rptr.2d 272], the court held that under article I, section 28, subdivision (d)

of the California Constitution, any felony and any misdemeanor involving moral turpitude could be used for impeachment, subject to the trial court's discretion. (*People v. Wheeler, supra*, at p. 296.) Defendant's convictions for possession of cocaine for sale and possession of a firearm by a felon both involved moral turpitude. (See *People v. Harris* (2005) 37 Cal.4th 310, 337 [33 Cal.Rptr.3d 509, 118 P.3d 545]; *People v. Littrel* (1986) 185 Cal.App.3d 699, 703 [230 Cal.Rptr. 83].)

Next, the People contend that the trial court properly permitted the prosecutor to question defendant on cross-examination about whether defendant had given police the Avenida Cerca address in July 1999, July 2002, October 2002, and April 2004, in making a traffic collision report and in signing traffic citations, because that evidence tended to impeach defendant's testimony. Defendant testified that on February 16, 2006, he had been living with Strange, and he had lived with Strange "off and on for 17 years." He testified he had been living with Strange in 2002 and 2003, but not in 2004. Evidence that defendant had given the Avenida Cerca address in 2002 was inconsistent with his testimony that he had been living with Strange in 2002 and was therefore relevant and admissible for purposes of impeachment. However, evidence that defendant had given the Avenida Cerca address in 1999 and 2004 was not inconsistent with defendant's testimony and was therefore irrelevant and inadmissible for purposes of impeachment. Nor did such evidence tend to show that defendant was living at the Avenida Cerca house in 2006. We therefore conclude it was an abuse of discretion to admit evidence of the 1999 and 2004 incidents.

The People further contend that the police observations of defendant's prior drug-related activities and testimony concerning defendant's statement to the police that he had armed himself and had gone to Gant's house to tell Gant to stop selling drugs because Gant was cutting into the gang's drug business were also admissible for impeachment. We agree that evidence of the statements defendant had made to Gant was relevant and admissible to impeach defendant's testimony that he had sold drugs to support his family and did not share the profits with the gang.

c. *Evidence of predicate crimes*

We next examine the evidence that was admitted to establish the predicate crimes for the gang charge and gang enhancement allegations. To prove the allegations under section 186.22, subdivisions (a) and (b), the prosecutor was required to establish that one of the gang's primary activities was the commission of one or more of the crimes listed in section 186.22, subdivision (e), and that the gang's members engaged in a pattern of criminal activity. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 322 [109 Cal.Rptr.2d

851, 27 P.3d 739] (*Sengpadychith*).) In that case, the court observed that "[s]ufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Id.* at p. 324.) And a "pattern" is established by the commission of two or more enumerated offenses committed on separate occasions or by two or more persons. (*People v. Loeun* (1997) 17 Cal.4th 1, 4 [69 Cal.Rptr.2d 776, 947 P.2d 1313].)

As noted above, the prosecutor introduced evidence of at least eight crimes committed by GPC members, and in argument to the jury, the prosecutor referred to several other incidents. We are unaware of any authority in which the court directly addressed the volume of evidence that may be introduced to establish the primary activities and predicate crimes elements of a gang enhancement or gang charge. However, any such evidence must be subject to scrutiny under Evidence Code section 352, and part of the analysis under that section is whether the evidence is cumulative. We will discuss below whether the admission of cumulative evidence resulted in prejudice.

### d. *Evidence as basis for expert testimony*

■ Gang evidence, including expert testimony, is relevant and admissible to prove the elements of the substantive gang crime and gang enhancements. (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192 [24 Cal.Rptr.3d 887].) Thus, a properly qualified gang expert may testify about a wide range of issues, including a gang's territory, retaliation, graffiti, hand signals, tattoos, and clothing. (*People v. Ochoa, supra,* 26 Cal.4th at pp. 438–439.)

Expert testimony is also relevant and admissible to explain how a gang benefits from drug sales and to prove the gang's primary activities. (*Sengpadychith, supra,* 26 Cal.4th at p. 324.) Defendant concedes that expert testimony was properly admissible for such purposes. He contends, however, that the foundation for the expert testimony was impermissible hearsay about prior crimes. We address that contention in a separate part of this opinion.

### e. *Evidence of prior arrests*

■ In several of the incidents set forth in the statement of facts, defendant was arrested for but never convicted of various crimes. Generally, evidence of mere arrests that do not result in convictions is inadmissible because such evidence invariably suggests the defendant has a bad character.[7] (*People v. Duran, supra,* 97 Cal.App.4th at pp. 1458–1459; see also *People v.*

---

[7] During pretrial discussions, the trial court ruled, and the prosecutor agreed, that evidence of mere arrests was inadmissible because such evidence is more prejudicial than probative.

*Anderson* (1978) 20 Cal.3d 647, 650 [143 Cal.Rptr. 883, 574 P.2d 1235] [holding that evidence of prior arrests was inadmissible because it suggested the defendant had a bad character]; *People v. Bryden* (1998) 63 Cal.App.4th 159, 183 [73 Cal.Rptr.2d 554] [assuming that questioning of witnesses about their arrests and misdemeanor convictions was prosecutorial misconduct, but finding such misconduct nonprejudicial].) A key consideration for trial courts in evaluating the prejudicial nature of the uncharged acts is whether the prior bad acts resulted in criminal convictions; prior convictions minimize the risk the jury would be tempted to punish the defendant for the uncharged acts. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405 [27 Cal.Rptr.2d 646, 867 P.2d 757] (*Ewoldt*), superseded by statute as stated in *People v. Britt* (2002) 104 Cal.App.4th 500, 505 [128 Cal.Rptr.2d 290].)

We conclude that evidence of prior arrests that did not result in convictions was inadmissible either as proof of guilt or for impeachment. (*People v. Medina* (1995) 11 Cal.4th 694, 769 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Anderson, supra*, 20 Cal.3d at p. 650.) We therefore conclude the trial court abused its discretion in admitting such evidence.

### 5. *Cumulative Evidence*

It is not enough for us to determine, incident by incident, whether the trial court might have had a reasonable basis for admitting evidence of prior crimes and police contacts. Defendant has also challenged the cumulative impact of admitting evidence of dozens of prior crimes.

Courts have recognized that evidence of other crimes is extremely inflammatory, and the trial court must take great care to evaluate its admissibility. (*People v. Roldan, supra*, 35 Cal.4th at p. 705.) The trial court must find that the evidence has substantial probative value that is not outweighed by its potential for undue prejudice. (Evid. Code, § 352; *Ewoldt, supra*, 7 Cal.4th at p. 404.)

At one point during the trial, the court observed that all of the prosecutor's evidence from the day before, up to 2:00 p.m., had been a repeat of previous evidence. The court stated, "the [district attorney] is entitled to the full force of their evidence. If they want to over-prove their case or put on all the evidence that they have, that's their right." When defense counsel objected under Evidence Code section 352 that such evidence was cumulative, the trial court responded, "I am exercising my discretion and declining to state that it's cumulative."

We strongly disagree with the view that prosecutors have any right to "over-prove their case or put on all the evidence that they have." In our

view, the trial court and the prosecutor must also be mindful of the burden on the court system and on the jurors who are required to disrupt their lives for the duration of the trial. In other contexts, courts have recognized the trial court's duty to consider the burden on jurors and the court itself in, for example, determining whether to grant a continuance. (E.g., *People v. Fudge* (1994) 7 Cal.4th 1075, 1105–1106 [31 Cal.Rptr.2d 321, 875 P.2d 36].) In short, the state has a strong interest in prompt and efficient trials, and that interest permits the nonarbitrary exclusion of evidence, including "when the presentation of the evidence will 'necessitate undue consumption of time.' " (*Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138, 1146–1147 [78 Cal.Rptr.2d 488].) Accordingly, neither the prosecution nor the defendant has a right to present cumulative evidence that creates a substantial danger of undue prejudice (*People v. Maestas* (1993) 20 Cal.App.4th 1482, 1494–1495 [25 Cal.Rptr.2d 644]) or that unduly consumes the court's time (*People v. Milner* (1988) 45 Cal.3d 227, 239–240 [246 Cal.Rptr. 713, 753 P.2d 669]). In *Ewoldt*, the Supreme Court emphasized that cumulative evidence of uncharged offenses may be inadmissible under Evidence Code section 352. The court explained, "In many cases the prejudicial effect of such evidence would outweigh its probative value, because the evidence would be merely cumulative regarding an issue that was not reasonably subject to dispute." (*Ewoldt, supra,* 7 Cal.4th at pp. 405–406.)

Applying this principle, in *People v. Leon* (2008) 161 Cal.App.4th 149, 168 and 169 [73 Cal.Rptr.3d 786], the court held that the trial court abused its discretion in admitting evidence of the defendant's prior juvenile robbery adjudication to establish both that the defendant was a gang member and that the group in question was a criminal gang. The court noted that the robbery convictions of other gang members were sufficient to establish the predicate offenses, and the evidence of the defendant's gang membership was overwhelming. (*Id.* at p. 169.) Thus, the court held, "the evidence of [the defendant's] 1999 robbery adjudication was 'merely cumulative regarding an issue that was not reasonably subject to dispute.' " (*Ibid.*) The court nonetheless found the error harmless. (*Id.* at pp. 169–170.)

Although no bright-line rules exist for determining when evidence is cumulative, we emphasize that the term "cumulative" indeed has a substantive meaning, and the application of the term must be reasonable and practical. Here, as in *People v. Leon*, we conclude it was an abuse of discretion to admit cumulative evidence concerning issues not reasonably subject to dispute. The sheer volume of evidence extended the trial—and the burden on the judicial system and the jurors—beyond reasonable limits, and the endless discussions among the trial court and counsel concerning the admissibility of such evidence amounted to a virtual street brawl. We next evaluate whether the introduction of the cumulative gang evidence and prior arrests evidence was prejudicial error.

## 6. Harmless Error

We evaluate error in the admission of prior crimes evidence using the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (*Watson*), under which we determine whether it was "reasonably probable that a result more favorable to defendant would have resulted" had the prior crimes evidence not been admitted. (*People v. Welch* (1999) 20 Cal.4th 701, 750 [85 Cal.Rptr.2d 203, 976 P.2d 754].) Defendant contends, however, that the erroneous admission of evidence rendered his trial fundamentally unfair, and therefore we should review the error under the harmless-beyond-a-reasonable-doubt test set forth in *Chapman v. California* (1967) 386 U.S. 18, 23–24 [17 L.Ed.2d 705, 87 S.Ct. 824].

Relying on *People v. Albarran* (2007) 149 Cal.App.4th 214 [57 Cal.Rptr.3d 92] (*Albarran*), and *People v. Bojorquez* (2002) 104 Cal.App.4th 335 [128 Cal.Rptr.2d 411] (*Bojorquez*), defendant argues the introduction of gang evidence and prior crimes evidence violated his due process right and led to a fundamentally unfair trial. In *Albarran*, the court held that gang evidence was only marginally relevant but was highly prejudicial, and the defendant's federal due process rights had been violated. (*Albarran, supra*, at pp. 230–232.) The court stated, however, that the case before it "present[ed] one of those rare and unusual occasions" where the error was of federal constitutional dimension. (*Id.* at p. 232.) The court explained, " 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.]" (*Id.* at p. 229.)

Similarly, in *Bojorquez*, the court found reversible error in the admission of gang evidence. In that case, the court concluded that the evidence of gang membership was relevant for impeachment, but because no gang enhancements or crimes were alleged, the charged crimes were not gang related, and the evidence against the defendant was not overwhelming, admission of evidence concerning crimes committed by gang members was irrelevant and prejudicial. (*Bojorquez, supra*, 104 Cal.App.4th at pp. 343–345.)

■ Here, in contrast to the situations in *Albarran* and *Bojorquez*, the challenged evidence had direct relevance to and was directly probative of the gang enhancement and substantive gang crime allegations. Moreover, we find no reasonable likelihood the "jury's passions were inflamed by the evidence of [the] uncharged offenses." (*Ewoldt, supra*, 7 Cal.4th at p. 405.) The danger in admitting gang evidence is that the jury will improperly infer that the defendant has a criminal disposition. (See *People v. Cardenas* (1982) 31

Cal.3d 897, 905 [184 Cal.Rptr. 165, 647 P.2d 569].) However, in this case, the jury acquitted defendant of possession of methamphetamine for sale and found him guilty of only simple possession. The jury also found not true the gang enhancement allegation attached to the felon in possession of a firearm. Thus, the jury did not accept the gang evidence and prior crimes evidence uncritically. Finally, we have no doubt that the jury would have reached the same result in the absence of the error.

Defendant concedes that some gang evidence was relevant and admissible to establish the predicate offenses and to establish defendant's continuing participation in the gang. Such relevant and admissible evidence could properly have included even the most inflammatory incidents. (See *People v. Valdez* (1997) 58 Cal.App.4th 494, 511–512 [68 Cal.Rptr.2d 135].)

█ The admissible evidence overwhelmingly established defendant's guilt of the substantive offenses and the truth of the gang enhancement allegations. The evidence established that drugs and weapons were found in the bedroom of the Avenida Cerca house where defendant was staying. Substantial evidence tied him to that house and to that room. The contraband was found in close proximity to personal possessions that were in turn tied to defendant. Ample admissible evidence established defendant's prior and current involvement with the gang and with drug sales. We conclude that the error in admitting cumulative gang evidence was harmless under *Watson*.

█ Moreover, the court properly instructed the jury that it was not permitted to consider the gang evidence to prove defendant has a bad character or is disposed to commit a crime. It is, of course, presumed the jury understood and followed the court's instruction in the absence of any showing to the contrary. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) Here, the jury found not true the gang enhancement allegation attached to count 1. In our view, this supports our conclusion that the jury fulfilled its duty as instructed.

## B. *Trial Court Misconduct*

Defendant contends the trial court committed misconduct in that (1) the trial court relinquished control of the proceedings to the prosecutor and refused to enforce its own rulings despite repeated violations by the prosecutor; (2) the trial court told the parties it could not rule fast enough, and counsel should "work it out"; (3) the trial court unfairly denied the defense the opportunity to present a two-minute demonstration after allowing the prosecution to introduce extensive cumulative testimony; and (4) the trial court held an improper ex parte discussion with the prosecutor before trial.

### 1. *Enforcement of rulings*

Defendant contends that the trial court recognized the prosecutor had ignored the court's rulings but had done nothing to enforce those rulings. Before trial, the court ruled that the prosecution could admit evidence of only three prior crimes under Evidence Code section 1101, subdivision (b). Defendant complains that during the prosecutor's opening statement, she referred to some 14 prior crimes, and during trial elicited testimony about multiple incidents.

To support his argument that the trial court failed to enforce its rulings, defendant cites the court's statements in the record, as follows: "I mean why did I bother ruling on them if you were going to put them in anyway, you know?" "Okay, I'm not arguing with that, I'm just saying, for example, in February of 1988 he threw a rock [of cocaine base], a rock under the car. And I ruled that it's—it's remote, it's 18 years old, it's vague, it's more prejudicial than probative. There was no sales evidence, no evidence of drug activity at the time, and so then under [Evidence Code section] 352 it's not coming in. [¶] You would think that you might say, well, that's fine, Judge, but, by the way, I'm going to put it in anyway through the expert, so why don't you let it in as [Evidence Code section] 1101 [subdivision] (b) because I'm going to put it in anyway? [¶] I just assumed when I ruled that way it ain't [*sic*] coming in."

Those statements were made outside the presence of the jury. Following the prosecutor's opening statement, defense counsel moved for a mistrial on the ground that the prosecutor had referred to various crimes which had either been ruled inadmissible or had never been brought up in pretrial discussions. The prosecutor responded that she had referred to the additional crimes as hearsay on which the expert witnesses had relied in forming their opinions, not as substantive evidence.

The trial court reminded counsel of its prior ruling that incidents it deemed inadmissible under Evidence Code section 1101, subdivision (b), might be introduced for other purposes, such as predicate acts to establish the gang allegations. Thus, the court's comments did not in fact indicate that the court failed to enforce its earlier ruling.

Moreover, the trial court requested counsel to jointly formulate a limiting instruction to be given to the jury. After the prosecutor finished her opening statement, the court instructed the jury, "You'll remember . . . that I told you that the evidence is what the witnesses say. Evidence is not what the attorneys say, not questions that they ask. So opening statement and closing arguments are not evidence, it's just for your information. [¶] Also, some of

the evidence in this case will come in for a limited purpose, not a complete consideration by you for all purposes. And when that evidence is introduced, you will be given an instruction that tells you how you can consider this type of evidence and for what purpose you can use it and for what purposes you can't." We conclude defendant has failed to show trial court misconduct in this instance.

### 2. *Maintaining Court Decorum*

Next, defendant contends the trial court committed misconduct by failing to maintain decorum in the courtroom.

#### a. *Additional background*

During a discussion outside the presence of the jury concerning whether the prosecutor's evidence was cumulative and unduly prejudicial, the trial court stated, "All right. Okay. Well, you two are not getting along. I think I'll try a different tack maybe. I'm not going to try to control you. I'll just let you two present your case as you want." The court later stated, "And so you people say all that before I even get a chance to react. So instead of trying to sit on you, I think I'll just let you two, you know, work it out between you." The prosecutor responded, "This is your courtroom, and I think it's important that you maintain control of the courtroom." The trial court stated, "I haven't been able to." The court added, "Okay. Well, we'll just—if it's all going to come out anyway, the jury's going to hear all the evidence eventually by the time you put all the witnesses on, so I'm sure it's not harming anything."

#### b. *Analysis*

The trial court has inherent and statutory discretion to control the proceedings to ensure the effective administration of justice (*People v. Gonzalez* (2006) 38 Cal.4th 932, 951 [44 Cal.Rptr.3d 237, 135 P.3d 649]) and has the duty to keep the trial within the bounds of the issues and not to stray into collateral matters (*People v. Alfaro* (1976) 61 Cal.App.3d 414, 421–424 [132 Cal.Rptr. 356]). The court also has the "duty to see that both sides receive a fair trial and that justice is done." (*Id.* at p. 427.)

Although defendant has quoted remarks of the trial court that *suggest* the court did not fulfill its duty, defense counsel has not cited to the record to show any *actual instance* in which the court in fact failed to rule on an objection or in fact required counsel to "work it out" between themselves. The record clearly shows the contrary. The prosecutor and defense counsel continued to raise objections, and the trial court continued to rule on them.

We therefore reject defendant's argument that the trial court committed misconduct by failing to maintain decorum in the courtroom.

### 3. Denying Defense Counsel the Opportunity to Present a Demonstration

Defendant argues that the trial court's denial of defense counsel's request to conduct a two-minute demonstration showed unequal treatment because the court had allowed the prosecutor to introduce evidence of scores of other crimes and arrests.

#### a. Additional background

The evidence indicated that defendant had stood at the front door of the Avenida Cerca house for two minutes before opening the door to admit the police officers. During cross-examination of one of the police officers, defense counsel stated, "I'll be quiet in the courtroom and we're going to wait and see how long two minutes is for people who could be in that bedroom, eight other people, and see how long they had to fool around, okay. [¶] And the clock is going." The court asked, "Can't we just estimate[?]" The court directed defense counsel to proceed with her next question. Defense counsel later complained to the trial court that, given the length of the prosecutor's opening statement, defense counsel should have been permitted to conduct the two-minute demonstration. After further discussion, the court responded, "I think you made that point."

#### b. Standard of review

The trial court has great discretion in regulating the conduct of trial, and we review the court's rulings concerning the conduct of trial only for abuse of discretion. (*People v. Gonzalez, supra,* 38 Cal.4th at p. 951.)

#### c. Analysis

Even if we assume for purposes of argument the trial court's ruling was improper, no prejudice resulted. During closing argument, defense counsel told the jury to "look at the clock for one minute and then just double it. And you'll see how long two minutes really is. [¶] Okay. That's one minute. Double that." Thus, defense counsel effectively made her point. The error, if any, was therefore harmless.

### 4. Ex Parte Discussion with Prosecutor Before Trial

Defendant contends the trial court committed misconduct by holding an ex parte discussion of the case with the prosecutor.

### a. *Additional background*

Before trial, the court and both counsel discussed trial scheduling in light of the fact that defense counsel would be taking a 30-day vacation. During the discussion, the prosecutor raised the issue of what would happen "if we go forward and put on 12 days worth of testimony and we can't complete the case and the court entertains a mistrial—we've dedicated 12 days of judicial resources and time and energy and to have the case mistried and to have to do the whole thing again." Following further discussion of the issue, the trial court stated, "Okay. Well, off the record this morning without the defense present you expressed a concern this was going to wind up being a mistrial, so I'm just asking you suggestions."

### b. *Forfeiture*

The People argue that the issue has been forfeited because defense counsel failed to raise any objection in the trial court. (See *People v. Jennings* (1991) 53 Cal.3d 334, 383–385 [279 Cal.Rptr. 780, 807 P.2d 1009].) However, we will address the issue on the merits because it is easily disposed of.

### c. *Analysis*

Under the Code of Judicial Ethics, "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding, except as follows: [¶] . . . [¶] (d) A judge may initiate ex parte communications, where circumstances require, for scheduling, administrative purposes, or emergencies that do not deal with substantive matters provided: [¶] (i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication, and [¶] (ii) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond." (Cal. Code Jud. Ethics, canon 3B(7)(d); see *People v. Seaton* (2001) 26 Cal.4th 598, 696 [110 Cal.Rptr.2d 441, 28 P.3d 175].) Here, it appears the ex parte communication did not fall within canon 3(B)(7)(d) because, by its terms, that provision applies only when the judge initiates the ex parte communication. The record indicates that here, the deputy district attorney initiated the conversation. Nonetheless, the context makes clear that the court's ex parte discussion with the prosecutor concerned scheduling matters, and the court promptly gave defense counsel notice of the conversation and an opportunity to respond. Even if the ex parte communication were improper, it could not have resulted in prejudice to defendant.

## C. *Expert Opinion Testimony About Ultimate Issues*

Defendant contends the trial court erred by permitting expert witnesses to give opinions on the ultimate issues.

### 1. *Standard of Review*

We review the trial court's ruling on the admissibility of expert opinion testimony for abuse of discretion. (*People v. Mendoza* (2000) 24 Cal.4th 130, 177 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

### 2. *Analysis*

Defendant cites Evidence Code section 805 and *People v. Killebrew* (2002) 103 Cal.App.4th 644 [126 Cal.Rptr.2d 876] (*Killebrew*) for the proposition that "the law clearly provides an expert witness may not testify on ultimate issues of fact which are reserved for the jury." However, Evidence Code section 805 provides directly to the contrary: "Testimony in the form of an opinion that is otherwise admissible *is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.*" (Italics added.) Similarly, the *Killebrew* court stated, "Otherwise admissible expert opinion testimony which embraces the ultimate issue to be decided by the trier of fact *is admissible.*" (*Killebrew, supra*, at p. 651, italics added.) The court clarified, " ' "Undoubtedly there is a kind of statement by the witness which amounts to no more than an expression of his general belief as to how the case should be decided . . . . There is no necessity for this kind of evidence; to receive it would tend to suggest that the judge and jury may shift responsibility for [the] decision to the witnesses; and in any event it is wholly without value to the trier of fact in reaching a decision." ' " (*Ibid.*) In light of these principles, in the next parts of this opinion we will examine the specific testimony about which defendant complains.

### 3. *Expert Opinion Testimony About Who Possessed Contraband*

Defendant argues that it was error to admit the testimony of Sergeant Anderson, Sergeant Beard, Detective Judd, and Officer Mike Kovaleff about who possessed the guns, drugs, and ammunition found at the Avenida Cerca house.

In *Killebrew, supra*, 103 Cal.App.4th at page 647, the defendant was convicted of conspiring to possess a handgun. At trial, a gang expert testified that each of the 10 gang members dispersed in three separate cars knew there were guns in two of the cars, and all 10 jointly possessed the guns for their mutual protection. On appeal, the court held it was error to permit the expert

to testify about the knowledge or intent of a defendant on trial. (*Id.* at p. 658.) Citing *Killebrew*, defendant argues it was error for the four witnesses to testify as to their opinions about the ownership of the guns and drugs found at the Avenida Cerca house.

### a. *Additional background*

During opening statement, defense counsel told the jurors that 10 people had been at the house on the day of the search, and Officer Beard had testified at the preliminary hearing and written in his report that all of them had access to and could have possessed the guns and methamphetamine. Thereafter, during cross-examination of Officer Beard, defense counsel elicited Officer Beard's testimony that he had written in his police report and had testified at the preliminary hearing that all the people present had had access to the contraband. Defense counsel asked, "[F]rom all your years of experience, could you say for sure that the guns and the methamphetamine belonged to [defendant]?" The prosecutor objected on the ground of relevance, and the trial court overruled the objection. Officer Beard then testified that in his opinion, the methamphetamine and guns belonged to defendant. At defense counsel's request, Officer Beard testified as to the basis for his opinion: "The fact that the gun . . . was found under [defendant's] pillow, in between his computer, his mail, in his bedroom, in a residence that he has lived, that shows—his driver's license shows him as being a resident there. As far as the guns and the drugs found in the garage, I would just say the same, this is his residence, and I suspect that they belong to him."

Next, during cross-examination of Sergeant Anderson, defense counsel elicited similar testimony about why Sergeant Anderson believed the guns and methamphetamine belonged to defendant. Defense counsel also asked Officer Kovaleff if the officer knew who the gun in the garment bag or the gun under the pillow belonged to. Over the prosecutor's objection, Officer Kovaleff testified he did not know that, and the "chances [were]" that the gun in the duffel bag belonged to defendant. Finally, in cross-examination of Detective Judd, defense counsel elicited testimony that Detective Judd agreed with Officer Beard's preliminary hearing testimony that all the people in the house could have possessed the drugs and guns. On redirect, the prosecutor elicited testimony that Detective Judd believed all those present during the search should have been prosecuted; the fact that others had access to the contraband did not change Detective Judd's opinion about defendant's involvement; and Detective Judd did not believe defendant could have been ignorant of the presence of the contraband.

### b. *Invited error*

The People argue that defendant elicited the bulk of the testimony about which he now complains and he failed to object to other testimony at trial and thus any error was invited. In *People v. Gutierrez* (2002) 28 Cal.4th 1083 [124 Cal.Rptr.2d 373, 52 P.3d 572], the court held that the doctrine of invited error precluded the defendant from arguing on appeal that the trial court had erred in ruling he could be impeached with a prior assault conviction because defense counsel had first elicited testimony before the jury that defendant had been in prison for assault on a police officer. (*Id.* at p. 1139.) As set forth above, the testimony about which defendant now complains was elicited by his own counsel. Thus, any error was invited, and defendant may not challenge that error on appeal. (*Ibid.*)

Moreover, in light of the extensive testimony on the issue—elicited by defense counsel—the trial court properly permitted the prosecutor to elicit, on redirect examination, Detective Judd's testimony that all the persons present were guilty of possessing the contraband. (See *People v. Steele* (2002) 27 Cal.4th 1230, 1249 [120 Cal.Rptr.2d 432, 47 P.3d 225].) Finally, defense counsel elicited testimony that all the men at the Avenida Cerca house at the time of the search were gang members, with the exception of Shaw, who associated with the gang. Defense counsel also elicited testimony that all those men had criminal histories, and some had been convicted of drug- or weapon-related offenses. Defense counsel reminded the jury of that evidence during argument. Under the circumstances, any error was harmless.

### 4. *Expert Opinion that Crimes Were Committed for the Benefit of the Gang*

Defendant contends Detective Judd[8] improperly testified that the crimes were committed for the benefit of the gang. To support his argument, defendant cites *In re Frank S.* (2006) 141 Cal.App.4th 1192 [46 Cal.Rptr.3d 839]. In that case, the juvenile court sustained allegations of a petition that a minor possessed a concealed dirk or dagger, with an attached gang enhancement, among other charges. The minor had been arrested in possession of methamphetamine, a knife, and a bandana, and he admitted he was a gang member. (*Id.* at p. 1195.) At trial, an expert witness "informed the judge of her belief of the minor's intent with possession of the knife . . . [and] stated the knife benefit[ed the minor's gang] since 'it helps provide them protection should they be assaulted by rival gang members.' " (*Id.* at p. 1199.) On appeal, the court reversed the gang enhancement for insufficient evidence

---

[8] Defendant actually contends Sergeant Anderson gave that testimony. However, the pages of the reporter's transcript to which defendant has cited show that the testimony was that of Detective Judd.

because "[t]he prosecution did not present any evidence that the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense." (*Ibid.*) The court reversed the true finding on the special allegation, holding that the expert testimony in conjunction with the minor's admitted gang membership was not sufficient to show the minor possessed the knife with the intent to benefit the gang. (*Id.* at p. 1195.)

■■■ Other courts, however, have repeatedly recognized that expert testimony is admissible on the issue of " 'whether and how a crime was committed to benefit or promote a gang.' " (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550 [25 Cal.Rptr.3d 124]; see *People v. Valdez, supra,* 58 Cal.App.4th at pp. 507–509.)

Here, defendant, who admitted prior gang membership and who sported gang tattoos, committed the charged offenses with a houseful of gang confederates in gang territory. Other evidence established that defendant was still a member of the gang. We conclude there was no error in the admission of expert opinion testimony that the crimes were for the purpose of benefiting the gang.

### D. *Foundation for Expert Opinion*

Defendant contends the police reports and hearsay relied upon by the gang expert were so unreliable the information should have been excluded.

#### 1. *Forfeiture*

The People argue that defendant forfeited his objection by failing to raise it in the trial court. The record reflects that defense counsel did object, at least once, to the use of hearsay when Detective Judd was discussing the April 10, 2004, incident at a nightclub. Although defendant has provided citations to the record to support his contention that other objections were raised below, none of the citations provided establishes that his counsel objected on the basis that the evidence constituted unreliable hearsay. We will nonetheless exercise our discretion to address the issue on the merits to forestall any claim of ineffective assistance of counsel. (See *People v. Lewis* (1990) 50 Cal.3d 262, 282 [266 Cal.Rptr. 834, 786 P.2d 892].)

#### 2. *Analysis*

An expert witness may give opinion testimony about gangs, and an expert witness may rely on hearsay as the basis for an opinion so long as the hearsay is reliable. (*People v. Gardeley* (1996) 14 Cal.4th 605, 618–620 [59

Cal.Rptr.2d 356, 927 P.2d 713]; *People v. Valdez, supra,* 58 Cal.App.4th at p. 509.) "A trial court, however, 'has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay.' " (*People v. Gardeley, supra,* at p. 619.) " '[P]rejudice may arise if, " 'under the guise of reasons,' " the expert's detailed explanation " '[brings] before the jury incompetent hearsay evidence.' " ' [Citations.] In this context, the court may ' "exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value." ' [Citation.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 137 [109 Cal.Rptr.2d 31, 26 P.3d 357].)

Gang experts may rely on their own investigations and information obtained from other law enforcement officers, including information from police reports, in forming their opinions. (*Sengpadychith, supra,* 26 Cal.4th at p. 324; *People v. Gardeley, supra,* 14 Cal.4th at p. 620.) In *In re I.M.* (2005) 125 Cal.App.4th 1195 [23 Cal.Rptr.3d 375], for example, the court held that the evidence was sufficient to support a true finding on a gang enhancement when an expert witness testified based on police reports. (*Id.* at pp. 1206–1208.)

As the court observed in *People v. Bell* (2007) 40 Cal.4th 582, 608 [54 Cal.Rptr.3d 453, 151 P.3d 292], " 'Most often, hearsay problems will be cured by an instruction that matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth. [Citation.]' " Here, the trial court repeatedly instructed the jury about the proper use of opinion testimony and the matters on which the opinion was based. During Sergeant Anderson's testimony about the December 1991 search, the trial court admonished the jury, "I think I told you initially in the instructions that certain evidence is introduced for a limited purpose, this is that type of evidence, evidence of prior acts in which the defendant is involved is introduced not to show any predisposition to commit a crime but to show that on this occasion that there is, maybe, an intent or motive or a lack of mistake or accident and possession and a person testifying as an expert can testify to hearsay, which is something that some other person said in formulating his opinion, it's not for you to consider as the truth of the matter but simply that he has considered it in formulating the expert opinion that he's testifying to . . . ." Later, during Sergeant Anderson's testimony about the December 1989 search, the court again admonished the jury that the evidence was offered for a limited purpose: "In this case it's not offered to show knowledge, motive, or absence of a mistake, it's only offered as something that this officer based his opinion on in forming a conclusion that it was possessed for sale on this occasion. That's the only purpose that you can consider that for."

The trial court further instructed the jury before it commenced deliberations, "During the trial, certain evidence was admitted for a limited purpose.

You may consider that evidence only for that purpose and for no other." In addition, the court instructed the jury that it must decide whether the information on which the expert witnesses relied was true and accurate. We presume the jury understood and followed those instructions. (See *People v. Danielson, supra*, 3 Cal.4th at p. 722.)

Moreover, even if the opinion testimony was based in part on unreliable hearsay, other unchallenged bases for those opinions remain. Detective Judd based his opinion that defendant was a current GPC member on, among other things, his own observations of defendant with other GPC members; the leadership position defendant took when another GPC member was being arrested in 2000; defendant's "RIP Tiny Crazo" tattoo, apparently referring to GPC member Tiny Crazo who had died in 2003; and letters found in the Avenida Cerca house dated in 2005 from a GPC member in prison. Finally, the jury's not true finding on one gang enhancement allegation establishes that the jury did not accept the experts' opinions uncritically.

Defendant further contends the admission of information he provided during jail intake interviews concerning his gang affiliation was unreliable because the purpose of the information was to place him in an appropriate unit for his own safety. He asserts that because he had an old gang tattoo, he had to be housed separately from rival gang members.

Defendant's argument merely goes to the weight of the evidence, but not its admissibility. (See *People v. Hoyos* (2007) 41 Cal.4th 872, 897 [63 Cal.Rptr.3d 1, 162 P.3d 528].) Defendant has not asserted that the officers misquoted him or that the intake forms were unreliable. Accordingly, we find no error.

### E. *Sufficiency of Evidence*

Defendant contends the evidence was insufficient to support his conviction because a police officer testified that any one of the seven persons present in the house could have possessed the guns and drugs.

#### 1. *Standard of Review*

" 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is

susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" [Citation.]' " (*People v. Abilez* (2007) 41 Cal.4th 472, 504 [61 Cal.Rptr.3d 526, 161 P.3d 58].) Thus, "[w]e presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129 [40 Cal.Rptr.3d 118, 129 P.3d 321], overruled in part on other grounds by *People v. Rundle* (2008) 43 Cal.4th 76, 151 [74 Cal.Rptr.3d 454, 180 P.3d 224].) "Unless it is clearly shown that 'on no hypothesis whatever is there sufficient substantial evidence to support the verdict' the conviction will not be reversed. [Citation.]" (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1162 [37 Cal.Rptr.3d 884].) The same standard of review applies to true findings on gang enhancement allegations. (*People v. Ortiz* (1997) 57 Cal.App.4th 480, 484 [67 Cal.Rptr.2d 126].)

### 2. *Analysis*

#### a. *Possession offenses*

Defendant contends the evidence was insufficient to support his conviction of the possession offenses. He claims the Avenida Cerca house was not his, and any and all of the other men of the house had as much or greater access to the contraband as he had.

When the police arrived at the Avenida Cerca house, defendant told them it was his house and he had been working on the computer in his room. During the search of the house, the officers found a loaded firearm under a pillow about a foot away from the computer that defendant had conceded was his. In the same room, the officers found two boxes of ammunition on top of a dresser and another box of ammunition in the closet inside a Louis Vuitton bag, which defendant's aunt testified resembled defendant's bag. Also in that room, the officers found two digital scales, plastic baggies, and pieces of plastic on the floor, as well as mail addressed to defendant at that address and two pieces of identification in defendant's name showing that address. Men's clothing in defendant's size was in the closet of that room. In the garage 10 or 15 feet away from defendant's room, the officers found the methamphetamine and a loaded gun with the word "Crip" etched on it. Defendant, who was unemployed, had almost $800 in cash in his pocket. Detective Judd, testifying as a gang expert, stated his opinion that defendant was the leader of the GPC's drug trade, which was one of the gang's primary activities.

■ Possession may be physical or constructive, and more than one person may possess the same contraband. (*People v. Montero* (2007) 155 Cal.App.4th 1170, 1175–1176 [66 Cal.Rptr.3d 668].) "Conviction is not precluded . . . if the defendant's right to exercise dominion and control over the place where the contraband was located is shared with another. [Citation.]" (*People v. Valerio* (1970) 13 Cal.App.3d 912, 921 [92 Cal.Rptr. 82].)

The evidence set forth above amply supported defendant's convictions of the possession offenses. In arguing that the evidence was insufficient, defendant asks this court to reweigh the evidence and view it in the light most favorable to the defense, contrary to the governing standard of review.

### b. *Gang enhancement allegations*

Defendant also challenges the sufficiency of the evidence to support the true findings on the gang enhancement allegations, arguing the evidence was insufficient to establish that the drugs were possessed for the benefit of the gang.

To establish a gang enhancement allegation, "the prosecution must prove that the crime for which the defendant was convicted had been 'committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.'" (*People v. Gardeley, supra,* 14 Cal.4th at pp. 616–617, quoting § 186.22, subd. (b)(1).)

Detective Judd stated his opinion that drug dealing was one of the primary activities of the GPC and that the drugs, guns, and ammunition found at the Avenida Cerca house were possessed for the benefit of the gang. He explained that selling the drugs would generate profits for the gang and the guns and ammunition could be used both to protect the drugs, cash, and gang members and for retaliation when necessary. The other men present at the Avenida Cerca house during the search were members or associates of the GPC.

That evidence amply supported the true findings on the gang enhancement allegations. As in *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 [5 Cal.Rptr.3d 615] (*Morales*), the court held that "the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members."

### c. *Street terrorism charge*

Defendant next challenges the sufficiency of the evidence to support his conviction of street terrorism under section 186.22, subdivision (a), because

he claims the evidence was insufficient to establish that he was still a gang member at the time of the search. He cites to his own testimony denying that he was currently a member of the gang and claiming that he was at the Avenida Cerca house to visit family members and childhood friends.

Again, defendant asks this court to view the evidence in the light most favorable to the defense. However, substantial evidence in the record, viewed in the light most favorable to the jury's verdict, amply supports defendant's conviction. In *People v. Martinez* (2008) 158 Cal.App.4th 1324 [70 Cal.Rptr.3d 680], the court held the evidence was sufficient to support the defendant's conviction of street terrorism under section 186.22, subdivision (a) when, among other evidence, a gang expert testified as to his opinion that the defendant was an active gang member based on the expert's review of booking photos of the defendant showing the defendant's gang tattoos, an interview with the defendant in which the defendant admitted gang membership and gave a gang moniker. (*People v. Martinez, supra*, at p. 1331.)

Here, defendant admitted he was a founding member of the GPC and had been a "shot caller" in the gang. Although defendant testified he had left the gang in the mid-1990's, Detective Judd testified as to his opinion that defendant was still an active member through 2006. Detective Judd based that opinion on his personal observations of defendant with other gang members; defendant's leadership position during the 2000 arrest of another GPC member; defendant's "RIP Tiny Crazo" tattoo; defendant's presence with other GPC members during a 2003 search in which the officers found guns, ammunition, counterfeit money, marijuana, and a scale in the house and $2,874 in cash in defendant's pocket; letters another GPC member had sent to defendant in 2005; defendant's admission of gang membership during a January 2006 traffic stop; and defendant's admission of gang affiliation during the jail intake process in February and July 2006. This evidence overwhelmingly supported a finding of defendant's current membership in the GPC.

As the court observed in *People v. Martinez*, "the sufficiency of the evidence showing active participation is not altered by the existence of other evidence offered by defendant to show he was not an active participant in the gang. Resolution of conflicting evidence and credibility issues was for the jury to decide. [Citation.] It is clear from the verdict finding defendant guilty of street terrorism that the jury believed he was actively participating in the gang. Because substantial evidence supports this determination, ' "that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Martinez, supra*, 158 Cal.App.4th at p. 1331.)

F. *Predicate Offense*

Defendant contends misdemeanor assault was erroneously listed as a predicate offense to support the gang charge and enhancement allegations.

To establish both the gang enhancement allegations under section 186.22, subdivision (b), and the substantive gang charge under section 186.22, subdivision (a), the prosecution was required to establish that the GPC was a criminal street gang. That, in turn, required proof that the GPC's members engaged in a pattern of criminal gang activity. (§ 186.22, subds. (e), (f).) The trial court instructed the jury with Judicial Council of California Criminal Jury Instructions, CALCRIM No. 1401, on the definition of a pattern of criminal gang activity: "The commission or attempted commission of or the conspiracy to commit or solicitation to commit or a conviction of or having a juvenile petition sustained for the commission of any combination of two or more of the following crimes: Sale of controlled substances, robbery, murder, or *assault* . . . ." (Italics added.) The trial court twice repeated that list of predicate crimes in other instructions.

An assault by means of force likely to cause great bodily injury or with a deadly weapon as defined in section 245 qualifies as a predicate offense; however, misdemeanor assault in violation of section 241 does not. (§ 186.22, subd. (e).) The People concede that the instructions on predicate offenses were incomplete or ambiguous as to what kind of assault would qualify as a predicate offense.

Here, the prosecutor elicited evidence of a number of predicate offenses, including at least three assault offenses: (1) the December 2002 incident in which three GPC members beat and smashed a man's face with a boulder, and one sustained a conviction for aggravated assault in violation of section 245, subdivision (a)(1); (2) the April 2004 incident at Denny's for which a GPC member sustained a conviction for assault in violation of section 245, subdivision (a)(1) with gang and great bodily injury enhancements; and (3) the July 2005 incident in which a GPC member offered a reward to the first junior member who could knock a 13-year-old boy unconscious, resulting in a conviction for assault in violation of section 245, subdivision (a)(1).

All those assault offenses involved convictions for aggravated assault; no evidence was introduced that any GPC member had been arrested for or convicted of simple assault. We therefore conclude the instructional error was harmless beyond a reasonable doubt because there is no reasonable likelihood it could have affected the jury's verdict. (See *People v. Pitto* (2008) 43 Cal.4th 228, 246 [74 Cal.Rptr.3d 590, 180 P.3d 338].) There simply was no evidence to which the jury could have misapplied the instruction.

## G. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct throughout the trial. Specifically, defendant contends the prosecutor (1) violated the trial court's rulings and appealed to the jury's prejudices; (2) improperly elicited testimony about arrests that had not resulted in convictions; (3) gave an incorrect legal explanation; (4) pressured defense witnesses until they invoked their Fifth Amendment privilege; (5) forced defendant and another witness to demonstrate gang hand signs in court; (6) lessened the burden of proof by telling jurors during closing argument that the burden of proof was whatever their gut instincts told them; (7) used a gang expert for drug testimony and a drug expert for gang testimony; and (8) maligned the character of defense counsel.

### 1. *Forfeiture*

The People argue that defendant's claims of prosecutorial misconduct were forfeited because defendant never raised an objection on that basis in the trial court. As a general rule, a defendant may not raise a complaint on appeal about prosecutorial misconduct unless he made a timely and specific objection in the trial court and requested that the jury be admonished to disregard improper argument or statements. (*People v. Stanley* (2006) 39 Cal.4th 913, 952 [47 Cal.Rptr.3d 420, 140 P.3d 736].) Although the record does not reflect that defense counsel objected at trial to every instance about which defendant now complains, we will nonetheless exercise our discretion to address the issue on the merits. (See *People v. Smith* (2003) 31 Cal.4th 1207, 1215 [7 Cal.Rptr.3d 559, 80 P.3d 662].)

### 2. *General Principles Regarding Prosecutorial Misconduct*

■ "Prosecutors play a dual role in the criminal justice system; they are advocates, but they are also administrators of justice. [Citation.] ' "[I]t is their sworn duty to see that the defendant has a fair and impartial trial, and that he be not convicted except by competent and legitimate evidence . . . ." ' [Citation.]" (*People v. Bryden, supra,* 63 Cal.App.4th at p. 182.) A prosecutor's intemperate behavior violates the federal Constitution when that behavior comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to deny the defendant due process. (*People v. Stanley, supra,* 39 Cal.4th at p. 951.) Under the state standard, conduct that does not render the trial fundamentally unfair is misconduct if it involves the use of deceptive or reprehensible methods to attempt to persuade the trier of fact. (*Ibid.*) "A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more

favorable to the defendant would have been reached without the misconduct. [Citation.]" *(People v. Crew* (2003) 31 Cal.4th 822, 839 [3 Cal.Rptr.3d 733, 74 P.3d 820].)

### 3. *Violating Trial Court's Ruling*

Defendant contends the prosecutor violated the trial court's ruling limiting the amount of prior crimes evidence that would be admissible. Defendant argues that at pretrial hearings, the trial court ruled the prosecution could introduce evidence of only three other crimes under Evidence Code section 1101, subdivision (b), specifically, the incidents on December 21, 1991, January 3, 1992, and April 1, 2003. However, during opening statement, the prosecutor purportedly mentioned not only those three incidents, but also numerous additional incidents, despite objections by defense counsel and mistrial motions, and thereafter elicited testimony about those incidents.

A prosecutor commits misconduct by eliciting evidence in violation of a ruling by the trial court or by referring during opening statements or closing arguments to evidence that the trial court has determined to be inadmissible. *(People v. Crew, supra,* 31 Cal.4th at p. 839.) Here, however, the trial court had ruled other incidents would be inadmissible under Evidence Code section 1101, subdivision (b), but the trial court also stated repeatedly it expected the same evidence would come in as predicate crimes to establish the gang enhancement allegations and substantive gang crime. Thus, defendant has failed to establish that the prosecutor violated the trial court's ruling.

### 4. *Eliciting Testimony About Arrests Without Convictions*

Defendant contends the prosecutor committed misconduct by eliciting evidence that defendant had been arrested for numerous crimes for which he had never been convicted. The trial court stated before trial that evidence of arrests was inadmissible, and the prosecutor had agreed that evidence of arrests was inadmissible. At trial, nonetheless, the prosecutor elicited testimony that defendant had been arrested for, but never convicted of, numerous crimes, and also elicited evidence of incidents for which defendant had not even been arrested.

In *People v. Bryden, supra,* 63 Cal.App.4th at page 183, the court assumed, for purposes of argument, that the prosecutor committed misconduct by eliciting evidence that witnesses had been arrested but found the error nonprejudicial. (See also *People v. Anderson, supra,* 20 Cal.3d at p. 650 ["it has long been held that evidence of an accused's prior arrests is inadmissible"].) "[M]ere arrests are usually inadmissible, whether as proof of guilt or impeachment . . . ." *(People v. Medina, supra,* 11 Cal.4th at p. 769;

cf. *People v. Beuer* (2000) 77 Cal.App.4th 1433, 1435 [92 Cal.Rptr.2d 572] [evidence of prior drug arrest was admissible under Evid. Code, § 1101, subd. (b) to show the defendant's knowledge of drugs].)

Here, as in *People v. Bryden*, we will assume, for purposes of argument, it was misconduct to elicit evidence that defendant had been arrested. However, for the reasons discussed above in connection with the admission of the prior crimes evidence, we find any error harmless. The properly admitted evidence overwhelmingly established defendant's guilt.

### 5. *Misstatement of Law to the Trial Court*

Defendant next asserts the prosecutor committed misconduct in stating to the trial court that evidence of other crimes and gang evidence was not subject to analysis under Evidence Code section 352.

During a pretrial discussion of the elements, the prosecutor was required to establish that the GPC was a street gang and what its primary activities were. The trial court asked, "Is that subject to [an Evidence Code section] 352 analysis when you're talking about simple possession of drugs here and you're introducing crimes of violence? Is that too prejudicial under [Evidence Code section] 352 for the jury to hear?" The prosecutor responded, "I don't think so, Your Honor."

Noting the context in which the statement was made, we believe it is apparent that the prosecutor was merely arguing that the evidence under consideration was not more prejudicial than probative under Evidence Code section 352, not stating as principle of law that Evidence Code section 352 did not apply at all under the circumstances. We therefore find no misconduct in the prosecutor's remark. And even if it were misconduct, defendant has not shown how the prosecutor's statement, made outside the presence of the jury, could have affected the outcome. In *People v. Hill* (1998) 17 Cal.4th 800, 829 and 830 [72 Cal.Rptr.2d 656, 952 P.2d 673], on which defendant relies, the court found the prosecutor committed misconduct by misstating the law before the jury. If error, the statement was harmless.

### 6. *Pressuring Defense Witnesses*

Defendant contends the prosecutor (1) pressured several defense witnesses until they invoked their Fifth Amendment privilege, and (2) intimidated a witness outside the courtroom. Defendant contends "[t]he trial court cautioned that defense witnesses involved in this case could be prompted by certain questions to assert a Fifth Amendment privilege since there was still time for the prosecution to file a case against them. [Citation.] [Defendant]

was the only individual prosecuted following this incident. The district attorney was aware of this issue before the defense case was presented." Although all the people present at the Avenida Cerca house had been arrested on possession charges, defendant was the only individual prosecuted.

■ As a general rule, "Governmental interference violative of a defendant's compulsory-process right includes . . . the intimidation of defense witnesses by the prosecution. [Citations.] [¶] The forms that such prosecutorial misconduct may take are many and varied. They include, for example, statements to defense witnesses to the effect that they would be prosecuted for any crimes they reveal or commit in the course of their testimony. [Citations.]" (*In re Martin* (1987) 44 Cal.3d 1, 30–31 [241 Cal.Rptr. 263, 744 P.2d 374].) They also include threatening a defense witness with a perjury prosecution. (*People v. Bryant* (1984) 157 Cal.App.3d 582, 586 [203 Cal.Rptr. 733].)

### a. *Gwen Crawford*

Defendant contends the prosecutor pushed defendant's aunt, Gwen Crawford, who testified on defendant's behalf, to assert her Fifth Amendment privilege. During her testimony, counsel was appointed to inform her of her Fifth Amendment privilege regarding charges she had maintained a drug house. Thereafter, Crawford asserted her Fifth Amendment privilege at least three times. The first time occurred through her appointed counsel out of the presence of the jury. The second and third times occurred during redirect examination when defense counsel asked Crawford who had been present at the Avenida Cerca house before she left on the day of the search. Each time, Crawford responded, "Trevon Smith. I plead the Fifth."

Thus, the record does not support defendant's contention that "[w]hile the prosecution questioned Crawford, she repeatedly asserted her Fifth Amendment privilege." Rather, Crawford asserted her privilege during defense questioning. Moreover, defendant has failed to show how he was prejudiced by the incident. Although the trial court warned it might have to strike her testimony, the court did not do so.

### b. *Manning, Session, Smith, Shaw, and Brandon Williams*

At trial, defense counsel informed the court that she had dismissed prospective defense witnesses Christopher Manning and Tracy Session because they indicated they would invoke their Fifth Amendment privilege. Trevon Smith and Bobby Shaw were called as defense witnesses. Both invoked their Fifth Amendment privilege, and the trial court found them unavailable.

Before Brandon Williams, defendant's brother, took the stand as a witness for the defense, counsel was appointed to represent him with respect to his Fifth Amendment privilege. His counsel reported that after consultation, Brandon would decline to testify. Outside the presence of the jury, Brandon was sworn and reaffirmed his desire not to testify under the Fifth Amendment. The trial court found him unavailable.

However, defendant does not point to any specific conduct on the part of the prosecutor that defendant characterizes as intimidation or pressuring of those witnesses; defendant's conclusionary argument that the prosecutor "pushed" Brandon to assert his Fifth Amendment privilege is insufficient. Moreover, the evidence did not show that Brandon Williams was even present at the Avenida Cerca house at the time of the search. We conclude defendant has failed to show misconduct.

### c. *Damion Lee*

Defendant called Lee as a witness. Lee testified he had been convicted of felony sales of cocaine in 1998, for which he had been to prison. Lee testified he knew Manning, Smith, Allen, Shaw, Session, Booty, and Brandon Williams because he had grown up with them in the same neighborhood. Lee was 32 years old at the time of defendant's trial. He testified that defendant had formerly been a member of the GPC but was not currently a member, nor was Lee currently a member. Lee had been at the Avenida Cerca house on February 16. Lee testified that Crawford lived there alone, but then testified Belinda Jones also lived there. He testified defendant did not live at that house, although defendant had stayed there once in awhile. Defendant lived with Strange, but when defendant and Strange had arguments, defendant would go to the Avenida Cerca house.

Lee testified that on February 16, Session, Manning, Allen, Smith, defendant, Shaw, and Booty had been at the Avenida Cerca house, but Brandon Williams had not been there. Booty had been ironing clothes for defendant, who was preparing to go to a funeral, and all the occupants of the house had been in the bedroom where defendant was "messing with his computer and trying to get his stuff packed." Defendant had gone to the door when the police arrived. After defendant opened the door, the police announced they were making a probation search. All the occupants of the house were arrested on the same charges as defendant.

The prosecutor cross-examined Lee extensively, and Lee asserted his Fifth Amendment privilege when the prosecutor asked him if he was presently a GPC member. The trial court thereafter struck Lee's testimony in its entirety. Lee was represented by counsel throughout his testimony, and his counsel stood next to him to provide advice.

Defendant has not shown any conduct of the prosecutor, such as a statement to Lee that he would be prosecuted for any crimes he revealed in the course of his testimony or threatening him with perjury prosecution, which led Lee to invoke his privilege. (See *In re Martin, supra,* 44 Cal.3d at p. 30; *People v. Bryant, supra,* 157 Cal.App.3d at p. 586.) As noted, Lee was represented by counsel and invoked the Fifth Amendment on the advice of his own counsel. When a witness is represented by independent counsel, coercion is less likely. (See *People v. Warren* (1984) 161 Cal.App.3d 961, 974 [207 Cal.Rptr. 912].)

Moreover, defendant has failed to explain how he was prejudiced by the prosecutor's conduct in regard to Lee. We find no error.

### d. *Latasha Strange*

At trial, defense counsel represented to the court that she had heard from three different people "that Detective Judd and Fallon went to the workplace of [defendant's girlfriend, Strange] . . . [who] felt she was being intimidated by them, telling them that [defendant] had slandered her . . . in his testimony, that now he's going to be implicating her in felonies and to talk about all the times he beat her up; doesn't she want to get him put away."

Here, however, it does not appear that defendant ever intended to call Strange as a defense witness; rather, in discussing the purported intimidation, defense counsel stated, "they're [the prosecution] trying to get her to testify— and she doesn't want to. Now, why they haven't subpoenaed her I don't know. I mean, they could subpoena her, and then she would have to testify." Defendant does not suggest in his brief on appeal that Strange was dissuaded from being a defense witness by the conduct of Detective Judd and Sergeant Fallon. Thus, even if we assume for purposes of argument that Strange was improperly pressured, defendant has failed to show any prejudice.

### 7. *Forcing Defense Witness and Defendant to Demonstrate Gang Signs in Court*

Defendant contends the prosecutor committed misconduct in asking Lee and defendant to demonstrate gang hand signs before the jury.

Over a defense objection on the ground of relevancy, the prosecutor requested Lee to demonstrate a gang sign in front of the jury. Lee's testimony

was stricken after he asserted his Fifth Amendment privilege. Later, when the prosecutor was cross-examining defendant, she asked him to flash a gang sign. Defense counsel did not object.

■■■ We are aware of no authority, and defense counsel has cited none, specifically addressing the propriety of requesting a witness to demonstrate a gang sign for the jury. Rather, the weight of authority supports the prosecutor's right to request the defendant or other witnesses to exhibit themselves or behaviors. In *People v. Atchley* (1959) 53 Cal.2d 160 [346 P.2d 764], for example, the court found no error when the prosecutor requested the defendant in a murder trial to demonstrate certain aspects of the alleged struggle with his wife. (*Id.* at p. 173; see also *People v. Turner* (1971) 22 Cal.App.3d 174, 182 [99 Cal.Rptr. 186] [holding that it was not error to require the defendant to model a scarf and sunglasses similar to those worn in a videomonitor photograph and to pose in the same manner as the person depicted in the photograph].) The only case defendant has cited, *People v. Jacobs* (1987) 195 Cal.App.3d 1636, 1656 [241 Cal.Rptr. 550], is not helpful to his position. In that case, the court simply stated that the trial court has considerable discretion in allowing courtroom demonstrations as well as other evidence, and it was not an abuse of discretion to allow a demonstration of how the defendant had grabbed an assault victim. (*Ibid.*)

Moreover, even if we assume, for purposes of argument, that the prosecutor's requests were improper, no prejudice resulted from the demonstrations. Both Lee and defendant admitted they were former members of the GPC. The gestures were not particularly inflammatory. And a photograph that depicted the GPC gang hand signs was introduced into evidence, and Detective Judd explained that photograph for the jury. We therefore conclude that any error was harmless.

### 8. *Argument to the Jury*

Defendant argues that the prosecutor committed misconduct by misstating the reasonable doubt standard in argument to the jury.

During rebuttal argument while addressing the evidence establishing defendant's gang membership, the prosecutor stated, "It's not one isolated incident. It's the totality of the circumstances. And that's what the burden of proof is. In your gut, when you stand back and you take in the totality of the circumstances, what does your gut instinct say to you? Does it say 'I know he did it' or 'No, he did not do it?' It's your gut instinct, and it's the totality of the circumstances." Defense counsel objected that the prosecutor misstated the reasonable doubt standard, but the trial court overruled the objection.

It is improper for the prosecutor to misstate the law generally, and in particular, to attempt to lower the burden of proof. (*People v. Hill, supra,* 17 Cal.4th at p. 829.) However, we do not reverse a defendant's conviction because of prosecutorial misconduct unless it is reasonably probable the result would have been more favorable to the defendant in the absence of the misconduct. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

Here, even if the prosecutor's argument was a misstatement of the law, the trial court properly instructed the jury on the prosecutor's burden of proving every element of the charges beyond a reasonable doubt. Both defense counsel and the prosecutor, in their arguments to the jury, acknowledged the burden of proving defendant guilty beyond a reasonable doubt. Finally, the trial court instructed the jury that it "must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." In the absence of evidence to the contrary, we presume the jury understood and followed the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 [111 Cal.Rptr.2d 129, 29 P.3d 209].) Moreover, in light of the overwhelming evidence against defendant, we find no reasonable likelihood the result would have been different had the prosecutor not made her argument about the meaning of reasonable doubt.

### 9. *Misuse of Experts*

Defendant next argues the prosecutor committed misconduct by using expert witnesses to testify about subjects for which they had not been designated as experts. Specifically, defendant contends Sergeant Anderson improperly testified as an expert witness that the crimes were committed for the benefit of the GPC because Sergeant Anderson was the prosecution's drug expert.

Defendant's counsel objected before trial to the prosecution's use of two gang experts. The prosecutor stated that Sergeant Anderson would testify as an expert on narcotics and the possession of narcotics for sale, and Detective Judd would testify as a gang expert on the history of the GPC and defendant's role in the gang.

At trial, the prosecutor called Sergeant Anderson as the narcotics expert and Detective Judd as the gang expert. Defendant complains that the drug expert gave gang testimony and the gang expert gave drug testimony, and the prosecutor's use of the experts for multiple purposes violated the trial court's earlier ruling and constituted misconduct. "It is misconduct for a prosecutor

to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order. [Citation.]" (*People v. Crew, supra*, 31 Cal.4th at p. 839.)

With one exception, the pages in the reporter's transcript which defendant cites to support his argument refer only to Sergeant Anderson's testimony.

Sergeant Anderson, the drug expert, testified as to his own observations of admitted GPC members, including their music and their wearing blue bandanas as gang uniforms. The trial court struck his testimony about the blue bandanas for lack of foundation. Sergeant Anderson then testified that he had seen persons he recognized as GPC members wearing baggy clothing and blue bandanas. That testimony was not expert opinion testimony, but was based on Sergeant Anderson's own observations.

With regard to the challenged testimony appearing at pages 414 to 418 of the reporter's transcript, the prosecutor asked Sergeant Anderson why the officers had conducted a probation search of the Avenida Cerca house. Sergeant Anderson responded, "[Defendant] is on probation. And a lot of this had to do with the so-called Gateway members, gang members, that were in the house. And it was my feeling that they were having a—one of their meetings and that I am familiar that [defendant] lives at that house and I know that he's on probation." When asked how he knew defendant lived there, he stated, among other things, his own prior contacts with defendant.

Defendant has also referred to pages 421 through 423 and 427 to support his argument that the prosecutor improperly used Sergeant Anderson as a gang expert. Those pages contain only discussions among the court and counsel.

The evidence defendant now objects to appearing on pages 490 through 494 and 568 of the reporter's transcript was evidence elicited by defense counsel on cross-examination. If error, it was invited. (*People v. Gutierrez, supra*, 28 Cal.4th at p. 1139.)

At page 574 of the reporter's transcript, Sergeant Anderson testified that he relied on a 1988 police report to support his opinion that defendant had started his career as a drug runner. Defense counsel objected that the testimony was beyond the scope, and the trial court sustained the objection on that ground.

We conclude that under the circumstances of the case, inevitably there was some overlap between the testimony of the drug expert and the testimony of the gang expert. The instances defendant has cited to us do not persuade us that the prosecutor exceeded the scope of Sergeant Anderson's designation and expertise.

The only testimony of Detective Judd, the gang expert, about which defendant now complains was Detective Judd's opinion that all the persons present at the Avenida Cerca house "should have been prosecuted for this case," and they all were equally guilty. Any error in using Detective Judd as a drug expert was harmless—the jury found defendant not guilty of possession of drugs for sale and found him guilty of only the lesser offense of simple possession.

### 10. *Maligning Character of Defense Counsel*

Defendant contends it was misconduct for the prosecutor to state that defense counsel was "suborning perjury" by calling defense witnesses who had been present at the house during the search, to state that the defense was calling witnesses "in bad faith," and to claim "this is subterfuge."

 It has been recognized as prosecutorial misconduct to disparage defense counsel in front of the jury. (*People v. Young* (2005) 34 Cal.4th 1149, 1193 [24 Cal.Rptr.3d 112, 105 P.3d 487] [accusing defense counsel of lying to the jury]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1302 [18 Cal.Rptr.2d 796, 850 P.2d 1] [accusing defense counsel of engaging in deception to the jury].) In *People v. Cummings*, the court stated, "If there is a reasonable likelihood that the jury would understand the prosecutor's statements as an assertion that defense counsel sought to deceive the jury, misconduct would be established. [Citation.]" (*Ibid.*) Here, however, the prosecutor's comments took place during pretrial discussions and thus could not have affected the jury. Thus, even assuming for purposes of argument the prosecutor's statements crossed the line, any resulting error was not prejudicial.

### 11. *Harmless Error*

Defendant argues that we should apply the *Chapman* standard to evaluate the prejudice from prosecutorial misconduct because defendant's rights to a fair trial and due process were violated. We disagree. The misconduct that

occurred, if any, did not rise to a due process violation. And, given the overwhelming evidence establishing defendant's guilt, we find it not reasonably probable that a more favorable result would have been obtained had the error not been committed. (*Watson, supra*, 46 Cal.2d at p. 836.)

### H. *Instruction on Specific Intent*

Defendant contends the trial court erred in instructing the jury that the specific intent required for the gang enhancement was to promote *any* criminal conduct. He argues the instruction incorrectly stated the law because the gang enhancement requires a specific intent to promote the charged offense to which the enhancement is attached, and the trial court's instruction permitted the jury to base the gang enhancement on speculative, uncharged criminal conduct.

#### 1. *Additional Background*

The trial court instructed the jury on the gang enhancement allegations with CALCRIM No. 1401 as follows: "In order to prove this allegation, the People must prove that: [¶] 1. The defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang; and [¶] 2. The defendant intended to assist, further, or promote criminal conduct by the gang members."

During deliberations, the jury asked, "In jury instruction 1401 under the first item No. 2, does criminal conduct by gang members refer only to crimes as described under primary activities of a criminal street gang or would smoking methamphetamine qualify as criminal conduct by gang members?"

At the prosecutor's urging, and over strenuous defense objection, the trial court responded, "[J]ury [I]nstruction 1401 in the second . . . element of the allegation the People must prove states, . . . 'criminal conduct by gang members' . . . . [¶] In this instruction criminal conduct means, . . . 'any criminal conduct and is not limited by that conduct listed under primary activities.'" About five minutes after it received this response, the jury reached a verdict.

#### 2. *Analysis*

■ The trial court has a sua sponte duty to give correct instructions on the basic principles of the law applicable to the case that are necessary to the jury's understanding of the case. (*People v. Avila, supra*, 38 Cal.4th at p. 568.) That duty requires the trial court to instruct on all the elements of the

charged offenses and enhancements. (See *People v. Birks* (1998) 19 Cal.4th 108, 112 [77 Cal.Rptr.2d 848, 960 P.2d 1073].)

 To support his argument that the instruction given as to the gang enhancements was erroneous, defendant relies on *People v. Hill* (2006) 142 Cal.App.4th 770, 774 [47 Cal.Rptr.3d 875], *People v. Romero* (2006) 140 Cal.App.4th 15, 19 and 20 [43 Cal.Rptr.3d 862] (*Romero*), and *Morales, supra,* 112 Cal.App.4th at page 1198. In *People v. Hill,* the court held that for purposes of section 186.22, subdivision (b), the prosecutor must establish " 'specific intent to promote, further, or assist in "*any* criminal conduct by gang members," ' " but there was no requirement that the defendant's intent related to criminal activity apart from the charged offenses. (*People v. Hill, supra,* at p. 774.) The *Romero* and *Morales* courts similarly held that evidence the defendant intended to commit the charged offenses with his fellow gang members was sufficient to satisfy the specific intent requirement of section 186.22, subdivision (b). (*Morales, supra,* at p. 1198; *Romero, supra,* at p. 19.) However, in our view, none of these cases may fairly be read as standing for the converse proposition—that the defendant's intent may *only* be to promote, further, or assist in the *charged* crimes.

Finally, the language "any criminal conduct" in CALCRIM No. 1401 is taken directly from section 186.22, subdivision (b)(1). Generally, the statutory language defining a crime is an appropriate and sufficient basis for an instruction. (*People v. Estrada* (1995) 11 Cal.4th 568, 574 [46 Cal.Rptr.2d 586, 904 P.2d 1197] [" 'If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language.' "].) Here, we conclude the trial court's response to the jury's request for clarification was fully consistent with the meaning of the statute. Nothing more was required.

## I. *Failure to Instruct on Definition of Principal*

Defendant contends the trial court erred in failing to instruct the jury sua sponte on the definition of the term "principal" because the prosecutor relied on aiding and abetting to establish defendant's guilt on count 5, participation in a criminal street gang. Specifically, defendant contends the trial court should have instructed the jury with CALCRIM No. 400. CALCRIM No. 400 (which does not use the word "principal") provides as follows: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she

may have aided and abetted a perpetrator, who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it."

### 1. *Additional Background*

During discussion of jury instructions, the prosecutor stated that one may be liable for active participation in a criminal street gang as an aider and abettor or as a direct perpetrator of other crimes, but that CALCRIM No. 1400 does not include the second theory. The prosecutor requested that the instruction be modified, and the trial court agreed to do so, although it was left unresolved where the modifying language would be inserted.

The trial court thereafter instructed the jury on the substantive gang offense as follows: "So the defendant is charged in count 5 with participating in a criminal street gang. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant actively participated in a criminal street gang; [¶] 2. When the defendant participated in the gang, he knew the members of the gang engage in or have engaged in a pattern of criminal gang activity; and [¶] 3. The defendant willfully assisted, furthered, or promoted felonious conduct by the members of the gang."

The trial court further instructed the jury, "To prove that the defendant willfully assisted, furthered, or promoted a crime, the People must prove that: [¶] 1. A member of the gang committed the crime; [¶] 2. The defendant knew that the gang member intended to commit the crime; [¶] 3. Before or during the commission of the crime the defendant intended to aid and abet the gang member in committing the crime; and [¶] 4. By the defendant's words or conduct he was a principal in the crime and he, in fact did aid and abet in the commission of the crime. [¶] Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of the crime."

### 2. *Analysis*

Section 31 defines a "principal" as follows: "All persons concerned in the commission of a crime, . . . and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed." A trial court is not required sua sponte "to define

terms that are commonly understood by those familiar with the English language, but it does have a duty to define terms that have a technical meaning peculiar to the law." (*People v. Bland* (2002) 28 Cal.4th 313, 334 [121 Cal.Rptr.2d 546, 48 P.3d 1107].) "A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning." (*People v. Estrada, supra*, 11 Cal.4th at p. 574.)

Defendant relies on *People v. Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318] (*Beeman*) and *People v. Patterson* (1989) 209 Cal.App.3d 610, 616–617 [257 Cal.Rptr. 407] (*Patterson*) to support his argument that it was error for the court to fail to instruct the jury on the definition of "principal."

In *Beeman*, the court found reversible error in the trial court's instruction on the criminal intent required to convict a defendant as an aider and abettor. (*Beeman, supra*, 35 Cal.3d at pp. 555–560.) The court found the error was prejudicial because the jury was not informed that to find the defendant guilty as an aider and abettor, it had to find that the defendant acted both with knowledge of the perpetrator's criminal purpose *and* with an intent or purpose of committing, encouraging, or facilitating commission of the offense. (*Ibid.*) The opinion did not address whether an instruction on the definition of "principal" was required.

In *Patterson*, the court held that instructing the jury on the definition of "principal" did not relieve the court of its duty to instruct on the definition of "aiding and abetting." (*Patterson, supra*, 209 Cal.App.3d at pp. 616–617.) The court found the error was prejudicial because the issue of intent was removed from the jury's consideration. (*Id.* at p. 617.) In dicta, the court added that the jury should be instructed as to the definitions of "principals" and of "aiding and abetting." (*Ibid.* & fn. 5.)

Here, even if error occurred, any failure to instruct on the definition of "principal" was harmless. Under the facts of this case, defendant could only have been guilty as a direct perpetrator or as an aider and abettor. Under either theory, he was a principal. (*People v. Calhoun* (2007) 40 Cal.4th 398, 402 [53 Cal.Rptr.3d 539, 150 P.3d 220].) Unlike in *Beeman* and in *Patterson*, the issue of his intent under the aiding and abetting theory was not removed from the jury's consideration.

### J. *Imposition of Upper Term for Gang Allegation*

Defendant contends imposition of the upper terms for count 3 and the gang allegation as to that count violated his Sixth Amendment right to a jury trial under *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348].

■ In imposing the upper term for count 3 and the attached gang enhancement, the trial court found as factors in aggravation that (1) defendant was armed; (2) he induced others to participate from his leadership position; (3) his prior convictions were numerous and of increasing seriousness; (4) he had served a prior prison sentence; (5) he was on probation when he committed the offenses; and (6) his prior performance on probation was poor. In *People v. Black* (2007) 41 Cal.4th 799 [62 Cal.Rptr.3d 569, 161 P.3d 1130] (*Black*),[9] our Supreme Court held that "imposition of the upper term does not infringe upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified based upon the defendant's record of prior convictions." (41 Cal.4th at p. 816.) The court concluded the defendant's criminal history justified the upper term sentence; the trial court had found the defendant's convictions were numerous and of increasing seriousness. (*Id.* at p. 818.) Here, likewise, defendant's prior convictions, prior prison term, probation status, and poor performance on probation were recidivist factors that justified imposition of the upper term. Because a single factor in aggravation can support an upper term sentence (*id.* at p. 813), the trial court's reliance on additional factors not found by the jury does not require remand for resentencing.

### K. *Other Sentencing Errors*

Defendant contends other sentencing errors occurred at trial. Specifically, defendant contends (1) the sentence for the gang enhancement in count 4 should have been one year (one-third the middle term); (2) count 2 should be stricken because it is a lesser included offense of count 3; and (3) the concurrent term for count 1 should be stayed under section 654.

#### 1. *Sentence for Gang Enhancement in Count 4*

Defendant contends his sentence for the gang enhancement as to count 4 should be reduced to one year. The trial court stated it was imposing

---

[9] Defendant acknowledges that *Black* is binding on this court under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].

one-third the middle term for the gang enhancement attached to count 4, and the trial court then sentenced defendant to one year four months for that enhancement. The People concede error. The sentence range provided in section 186.22, subdivision (b)(1)(A) is two, three, or four years. Consequently, the sentence on the gang enhancement should be reduced to one year.

### 2. Sentence for Count 2

Defendant contends count 2 (possession of methamphetamine, Health & Saf. Code, § 11377, subd. (a)) should be stricken because it is a lesser included offense of count 3 (possession of a controlled substance while armed, Health & Saf. Code, § 11370.1, subd. (a)) or, in the alternative, the sentence for count 2 should be stayed under Penal Code section 654.[10] In pronouncing sentence, the trial court stated, "Now Count II was a lesser [Health and Safety Code section] 11377 and that is a lesser included of [Health and Safety Code section] 11370. So I think that it either should be stricken along with its allegation or if a mid term is imposed it should be stayed under [section] 654." The minute order shows that a concurrent middle term of two years was imposed for count 2, and the abstract of judgment shows that the term was stayed under section 654.

■ Under California law, a defendant who commits a single act or course of conduct may be convicted "of any number of the offenses charged." (§ 954.) However, "a judicially created exception to this rule prohibits multiple convictions based on necessarily included offenses. [Citations.] [¶] In deciding whether an offense is necessarily included in another, we apply the elements test, asking whether ' " 'all the legal ingredients of the corpus delicti of the lesser offense [are] included in the elements of the greater offense.' [Citation.]" ' [Citation.] In other words, 'if a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.' [Citation.]" (*People v. Montoya* (2004) 33 Cal.4th 1031, 1034 [16 Cal.Rptr.3d 902, 94 P.3d 1098] (*Montoya*).) Thus, the court held, unlawful taking of a vehicle under Vehicle Code section 10851, subdivision (a), was not a lesser included offense of carjacking under Penal Code section 215, subdivision (a), because "a person can commit a carjacking without necessarily committing an unlawful taking of a vehicle." (*Montoya, supra*, at p. 1035.)

---

[10] As noted above, the record reflects that the sentence for count 2 was in fact stayed under section 654. Defendant's contention that the sentence should be stayed is therefore moot.

The defendant in *Montoya* argued that the court should, in the alternative, apply the accusatory pleading test, under which the court examines whether " ' " 'the charging allegations of the accusatory pleading include language describing the offense in such a way that if committed as specified [some] lesser offense is necessarily committed.' [Citation.]" ' " (*Montoya, supra*, 33 Cal.4th at p. 1035.) The Supreme Court declined to reach the issue because the outcome would have been the same under either test. (*Id.* at pp. 1035–1036.) Two years later, however, the Supreme Court did address that precise issue and held that the only test for determining whether a defendant may be convicted of multiple charged crimes is the statutory elements test. (*People v. Reed* (2006) 38 Cal.4th 1224, 1229 [45 Cal.Rptr.3d 353, 137 P.3d 184].)

 Our task, then, is to examine the elements of the two crimes. Health and Safety Code section 11377, subdivision (a), makes it a crime to possess certain controlled substances as set forth in a detailed list: "(a) Except as authorized by law and as otherwise provided in subdivision (b) or Section 11375, or in Article 7 (commencing with Section 4211) of Chapter 9 of Division 2 of the Business and Professions Code, every person who possesses any controlled substance which is (1) classified in schedule III, IV, or V, and which is not a narcotic drug, (2) specified in subdivision (d) of Section 11054, except paragraphs (13), (14), (15), and (20) of subdivision (d), (3) specified in paragraph (11) of subdivision (c) of Section 11056, (4) specified in paragraph (2) or (3) of subdivision (f) of Section 11054, or (5) specified in subdivision (d), (e), or (f) of Section 11055, unless upon the prescription of a physician, dentist, podiatrist, or veterinarian, licensed to practice in this state, shall be punished by imprisonment in a county jail for a period of not more than one year or in the state prison." Methamphetamine is defined as a controlled substance in Health and Safety Code section 11055, subdivision (d)(2), and is therefore included among the controlled substances subject to Health and Safety Code section 11377, subdivision (a).

Health and Safety Code section 11370.1, subdivision (a), makes it a crime to be armed with a firearm while in possession of a different list of controlled substances: "(a) Notwithstanding Section 11350 or 11377 or any other provision of law, every person who unlawfully possesses any amount of a substance containing cocaine base, a substance containing cocaine, a substance containing heroin, a substance containing methamphetamine, a crystalline substance containing phencyclidine, a liquid substance containing phencyclidine, plant material containing phencyclidine, or a hand-rolled cigarette treated with phencyclidine while armed with a loaded, operable firearm is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years."

Thus, a violation of the greater offense under Health and Safety Code section 11370.1 may be based on possession of heroin or cocaine, among other substances, that are not included in Health and Safety Code section 11377, subdivision (a). Rather, heroin is listed as a controlled substance under schedule I (Health & Saf. Code, § 11054, subd. (c)(11)), and cocaine is listed as a controlled substance under schedule II (Health & Saf. Code, § 11055, subd. (b)(6)).[11] Thus, Health and Safety Code section 11370.1 may be violated without necessarily violating Health and Safety Code section 11377, subdivision (a). Under the statutory elements test, a violation of Health and Safety Code section 11377, subdivision (a) is not a lesser included offense of a violation of Health and Safety Code section 11370.1, and count 2 need not be stricken.

### 3. Sentence for Count 1

Defendant contends his concurrent term for count 1 (possession of a firearm by a felon) should be stayed under section 654.

In pronouncing sentence, the trial court stated, "Then starting in order, Count I is a 16, 2, or 3 crime, *but [I] think it has the same act and intent as [Health and Safety Code section] 11370.1*, so it should be like mid term two years concurrent with Count III." (Italics added.) The abstract of judgment reflects that the trial court imposed a concurrent middle term of two years for possession of a firearm by a felon in violation of Penal Code section 12021, subdivision (a)(1) in count 1, and a four-year term for possession of a controlled substance while armed in violation of Health and Safety Code section 11370.1 in count 3.

Section 654 prohibits multiple punishment for a single act or an indivisible course of conduct. (§ 654; *People v. Deloza* (1998) 18 Cal.4th 585, 591 [76 Cal.Rptr.2d 255, 957 P.2d 945].) Whether a defendant's conduct constitutes a single act under section 654 depends on the defendant's intent in violating penal statutes. If the defendant harbors separate though simultaneous objectives in committing the statutory violations, multiple punishment is permissible. (*People v. Britt* (2004) 32 Cal.4th 944, 952 [12 Cal.Rptr.3d 66, 87 P.3d 812].) This question is one of fact for the trial court, and we uphold the trial court's finding if it is supported by substantial evidence. (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1466 [83 Cal.Rptr.2d 307].)

In *People v. Dominguez* (1995) 38 Cal.App.4th 410 [45 Cal.Rptr.2d 153] (*Dominguez*), the trial court made a finding that section 654 applied to the

---

[11] Simple possession of heroin or cocaine is a separate crime under Health and Safety Code section 11350, subdivision (a).

defendant's conviction for robbery but imposed a concurrent term for that count instead of staying the sentence under section 654. (*Dominguez, supra,* at pp. 416, 420.) On appeal, the court held that the trial court's factual finding was binding if supported by substantial evidence, which it was. (*Id.* at p. 420.)

Here, similarly, the trial court announced its finding that counts 1 and 3 involved the same act and intent. That finding is supported by substantial circumstantial evidence in the record. The trial court therefore erred under section 654 in imposing a concurrent term rather than staying the punishment for count 1. (*Dominguez, supra,* 38 Cal.App.4th at p. 420.) We will direct that the abstract of judgment be amended accordingly.

### 4. *Sentence on Gang Enhancement for Count 2*

In our review of the record, we determined that the record does not reflect any disposition of the gang enhancement allegation attached to count 2. Although the trial court stayed the sentence for count 2 under section 654, the court did not announce any sentence for the section 186.22, subdivision (a) enhancement as to that count, nor does the record show that the enhancement was stricken in the interest of justice. (See, e.g., *People v. Torres* (2008) 163 Cal.App.4th 1420, 1433 & fn. 7 [78 Cal.Rptr.3d 444].) In the interest of completeness, therefore, we will remand the matter to the trial court for the limited purpose of stating the disposition of that gang enhancement allegation.

### L. *Cumulative Error*

Defendant contends cumulative errors resulted in a fundamentally unfair trial. Under the cumulative error doctrine, the reviewing court must "review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence." (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349 [234 Cal.Rptr. 442].) When the cumulative effect of errors deprives the defendant of a fair trial and due process, reversal is required. (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795 [118 Cal.Rptr.2d 668].)

Here, any errors that we have found, and any others we may have assumed for purposes of argument, were harmless under any standard, whether considered individually or collectively. (See *People v. Rogers* (2006) 39 Cal.4th 826, 911 [48 Cal.Rptr.3d 1, 141 P.3d 135].) As discussed above, the evidence against defendant was overwhelming.

## IV. DISPOSITION

The matter is remanded to the trial court for the purpose of imposing sentence on the gang enhancement allegation attached to count 2. In addition, the trial court is directed to stay the sentence for count 1 under section 654 and to amend the abstract of judgment accordingly, and to reduce defendant's sentence for the gang enhancement as to count 4 to one year. In all other respects, the judgment is affirmed.

Ramirez, P. J., and Gaut, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 13, 2009, S170782.