Filed 1/10/14  P. v. Willis CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E057518 |
| v. | (Super.Ct.No. RIF1202867) |
| JOSHUA JERBAR WILLIS, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Thomas D. Glasser, Judge.  Affirmed.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant Joshua Jerbar Willis guilty on three counts of second degree burglary (Pen. Code,[1] § 459, counts 1-3), and on one count of actively participating in a criminal street gang in violation of the Street Terrorism Enforcement and Prevention Act (STEP Act) (§ 186.22, subd. (a), count 4). The jury also found true allegations that defendant committed the three burglaries for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subd. (b).) After finding true allegations that defendant suffered a prior strike conviction for purposes of section 667, subdivisions (c) and (e)(1), and finding true allegations that defendant suffered three prison priors for purposes of section 667.5, subdivision (b), the trial court sentenced defendant to 16 years eight months in state prison.

On appeal, defendant admits that he committed the three burglaries but contends the record does not contain substantial evidence to support his conviction for active participation in a criminal street gang or to support the jury's true findings that he committed the burglaries for the benefit of a criminal street gang for purposes of the gang enhancements. We conclude the record does contain substantial evidence to support the jury's verdict and findings, and we affirm the judgment.

---

[1] All additional undesignated statutory references are to the Penal Code.

FACTS

A. The Underlying Crimes

Over a week and a half in May 2012, defendant, along with his cousin Rohann Scott and his brother Donald Ray Willis, stole video game systems and video games worth almost $3,000 from Target stores in San Dimas, City of Industry, and Eastvale. A Target employee called the Riverside County Sheriff's Department when the three men were seen together entering the Eastvale store a second time. Sheriff's deputies responded and arrested the three men. The next day, officers searched one of the suspect's impounded vehicles and discovered backpacks filled with video games.

B. Gang Expert Testimony

An officer assigned to the San Bernardino Police Department's Gang Investigation Unit testified that defendant was an active member of the Pimp Player Hustler Gangster Crips gang, a homegrown gang located on the eastside of the City of San Bernardino. The officer became acquainted with the gang when he was a patrol officer, and he came into contact with 20 to 25 of its members during arrests or consensual encounters. The officer testified the gang goes by the names PPHG or PPHGC and uses the color blue and the symbols "P" or "4." The gang had between 80 and 85 documented members at the time of defendant's arrest and had as its primary activity the commission of crimes listed in section 186.22, subdivision (e). The officer testified to three predicate crimes committed by admitted PPHG members Anthony Gilmore, Edward Gilmore, and

Sidikiba Greenwood, Jr., in order to establish that the PPHG was engaged in a course of criminal activity.[2] Based on those and other crimes of which he was familiar, the officer opined that the PPHG was engaged in a pattern of criminal conduct for purposes of section 186.22.

The officer testified that he became familiar with defendant and his two confederates in the burglaries by reviewing police reports, gang field investigation cards, and photographs of defendant, and by reviewing the security footage of the Target store burglaries. According to the officer, the PPHG members were "real close" and have many family members in the gang. The officer testified that one factor behind his opinion that defendant was an active member of the PPHG is that defendant's confederates were close family members and active members of the gang. The officer based his opinion about Donald Willis's active gang membership on his review of gang field investigation cards and based on three of Willis's tattoos: (1) "PPHGC," (2) "G" and "C," which stands for "Gangster Crip," and (3) "Sticc Up Kid," which the officer testified was significant because Crips gangs never spell words with "ck" because it stands for "Crip Killer." The officer opined that Rohann Scott was also an active member of the PPHGC based on the "PPHGC" tattoo on his back and the letters "ES" tattooed on his right shoulder, which is short for "Eastside" and refers to the Eastside of San Bernardino where the gang is located.

---

[2] Defendant does not challenge the sufficiency of the evidence to establish the existence of these predicate crimes.

Moreover, the officer testified that when defendant was booked into the county jail, he identified himself as a member of the PPHG during his classification interview. The officer also reviewed gang field investigation cards and spoke to officers who had made prior contacts with defendant in 2003, 2004, 2009, 2010, and 2011, during which defendant admitted he was a gang member. The officer testified the most important fact for him, from the standpoint of a gang investigator, was defendant's tattoos. Defendant had a tattoo of the letters "PPHG" and of his gang moniker "JMac" on his right forearm. The tattoos were important, according to the officer, because they showed defendant's loyalty to the gang. The officer testified that, in order to get a PPHG tattoo, a member had to earn it by being "jumped" into the gang, by putting in work for the gang by committing a crime as initiation, or by being grandfathered or "walk[ed] in" to the gang based on a familial connection with the gang. According to the officer, if a gang member wished to get out of the gang, but could not afford laser removal, he would have a black line tattooed over the gang's tattoo.

The officer testified that part of gang culture is putting in work or committing a crime for the gang, most often by selling illegal narcotics, committing assaults against members of rival gangs, or committing residential or commercial burglaries. The proceeds from the sale of illegal narcotics and burglaries, according to the officer, are used by the gang to purchase guns and to purchase more narcotics for sale, or to purchase status symbols such as expensive clothing and tennis shoes that are worn for recruitment purposes. The officer testified that the fact defendant stole from three Target stores in a

5

week-and-a-half period, accompanied by two active members of PPHG, demonstrated he was an active member of the gang.

Another factor on which the officer relied in forming his opinion about defendant was defendant's presence at the March 2012 funeral of Anthony Gilmore, who was killed by police during a traffic stop. According to the officer, inactive members of a gang or members who were not in good standing, were not permitted to attend the funeral of an active member, so defendant's presence at the funeral "shows me that he's still active because he's allowed to come to that gang funeral." The officer described to the jury photographs taken at the funeral depicting defendant with his confederates Donald Willis and Rohann Scott, and with "Spicy Low," one of the founding members of the PPHG. Moreover, the officer testified that the way Anthony Gilmore died at the hands of the police made the funeral and defendant's presence there especially important.

Finally, the officer testified he based his opinion that defendant was an active member of the PPHG gang on the crimes defendant had committed. In October 2004, defendant was convicted of being a felon in possession of a firearm, which is a primary activity of the gang. Moreover, the officer opined the Target store burglaries constituted defendant "putting in work" for the gang, which would help elevate his status in the gang because the proceeds obtained by selling the stolen merchandise could be used by the gang to buy guns to commit other crimes or to buy illegal narcotics for resale.

On cross-examination, the officer testified that, during a January 2011 encounter with another officer, defendant said he wanted to get out of the gang and have no further contact with gangs. With respect to defendant's self-identification as a member of a gang

6

during his jail classification interview, the officer testified that a former gang member, who no longer associates with a gang, would likely ask to be placed in protective custody to avoid being assaulted by current members of his old gang and rivals alike.

On redirect, the officer testified the Target store burglaries were not necessarily committed for the benefit of the PPHG, but were committed in association with the PPHG members, so it did not matter if the proceeds from the stolen merchandise were actually used to buy guns or drugs for the gang. The officer testified that if defendant had in fact left the gang, the repercussions for showing up at the funeral of Anthony Gilmore would be that he would be assaulted as soon as he got there. The gang is like "a brotherhood," according to the officer, so if defendant walked out of the gang, he would not have been a member in good standing and would not have been welcome at any of the gang's events, especially at the funeral. That defendant continued to spend time with his brother and cousin outside of family settings and committed the burglaries with them showed defendant was still an active member of the gang. The officer opined that jail classification interviews are reliable in determining if someone is a member of a gang because if a gang member is housed in the general population, instead of with members of his gang, he may face some serious repercussions.

Finally, on further cross-examination, the officer testified that one way to leave a gang is to simply move away from the gang's territory. Although at some point defendant moved from San Bernardino to Victorville, the officer testified that members of the PPHG scattered from San Bernardino to neighboring cities and into Los Angeles

7

County when the accidental murder of an 11-year old girl by a PPHG member led to increased police suppression of the gang.

### C. Defense Evidence

Roeshella Rockmore, defendant's first cousin, testified that she and defendant were close, and that she lived with defendant from 2006 to 2008 and again from 2010 until just before his arrest. Although she was aware of defendant's gang tattoo, Rockmore testified that she never saw defendant dress like a "gang banger," hang out with gang members, "see him doing gang signs," or do anything else to indicate he was a gang member. Rockmore testified that defendant spent time with his family, including with Rohann Scott and Donald Willis, although she denied the latter two were gang members. Rockmore testified that no gang members ever attended the family gatherings that she and defendant attended. On cross-examination, Rockmore testified she did not believe that Rohann Scott and Donald Willis were gang members and that she never saw them or defendant engage in gang activity.

Tonya Corbett, another of defendant's first cousins, testified that she and defendant have been close all his life, and she helped raise him. Corbett testified that defendant got a gang tattoo, and that he was a gang member when he was young. Corbett testified that in recent years, she would see defendant as much as four times a week but never saw him in the company of gang members. Corbett testified that she saw defendant in the company of Rohann Scott and Donald Willis, but testified that to her knowledge those two were not active gang members. Corbett saw defendant wear blue clothing, but she never saw defendant flash gang signs. According to Corbett, defendant mostly spent

8

time with family members. Corbett testified that she never saw defendant with drugs, and that the only time she saw defendant with a gun was when he was a teenager. On cross-examination, Corbett testified she did not believe defendant was an active gang member because he was not around gangs. Corbett's opinion would not be different even if she believed that on several occasions defendant admitted to police that he was a gang member.

Defendant testified that at the time of his arrest, he lived in Hesperia with the mother of his children. He affiliated with the gang when he was about eight years old, joined the gang when he was about 13 years old, and got his gang tattoo when he was 14 or 15 years old. Defendant testified he was never "jumped" into the gang, but interacted with the gang's members and eventually joined through relatives in the gang. He joined the gang to fit in, and he drank beer and "smoked weed" with fellow members.

In 2004 or 2005, defendant decided to leave the gang life. Although defendant had been in trouble with the law since his decision to leave the gang, he testified it had nothing to do with gangs. When defendant decided to leave the gang, he moved to Victorville with his aunt to get away from the gang. Defendant testified he never got "jumped out" of the gang or made a formal declaration that he was quitting the gang—he simply moved to try and distance himself from the gang. He testified that he did not hang around gang members after moving to Victorville. Defendant disputed the gang expert's testimony that gang members could not simply walk out of a gang or move away.

Defendant testified he attended the funeral of Anthony Gilmore to pay his respects, and that he wore black instead of blue because he was not a gang member

9

anymore. Defendant disputed the gang expert's testimony that defendant would have been harmed and not allowed to attend the funeral if he had left the gang. Defendant testified it would not have made a difference, and he would have been allowed to attend the funeral even if he formally left the gang and got "jumped out." Defendant admitted that on several occasions during encounters with the police, he told the officers he was in a gang, but he also testified that he told one officer that he wanted to leave the gang. With respect to his jail classification interview, defendant testified that he told the deputies he was involved with gangs and, for his safety, he told them he used to be a member of the PPHG. Defendant did not ask to be placed in protective custody, instead of being housed with members of his former gang, because he did not want to be housed with child molesters, rapists, or snitches. He testified that if he was seen wearing a blue wristband, which signifies protective custody, word would get out that he might be a snitch.

Defendant admitted to committing the Target store burglaries but denied that they had anything to do with a gang. Instead, defendant testified he planned on using the proceeds from the stolen property to buy diapers, baby clothing, and to pay rent. Finally, defendant testified he did not consider himself a member of the PPHG.

On cross-examination, defendant testified that gang dropouts in jail were also housed in protective custody but said many who say they were gang dropouts were merely trying to avoid paying a debt or using that as an excuse to be housed away from other gang members. Defendant did not ask to be housed in protective custody because, unlike White and Hispanic gangs, which were less tolerant of dropouts, Black gangs were

10

"a little bit more lenient." He denied that he self-admitted to being a gang member during his jail classification interview. "They asked me [if I was] affiliated, and I told them, yeah." Defendant testified he wanted to be housed with the PPHG, not because he necessarily wanted to be with Crips, but because he feared that his tattoos and former affiliation might cause him to be stabbed or get into fights if he were housed with Bloods.

Defendant also testified on cross-examination that he moved from San Bernardino in 2005, but denied that it had anything to do with the murder of the 11-year old girl that year. He moved to get away from the gang. Finally, defendant testified he was aware that the PPHG was engaged in a pattern of criminal activity, but he denied that he participated in that pattern of criminal activity and denied that he ever possessed a firearm as a member of the gang.

DISCUSSION

I

SUBSTANTIAL EVIDENCE SUPPORTS DEFENDANT'S

CONVICTION UNDER SECTION 186.22, SUBDIVISION (a)

Defendant challenges the sufficiency of the evidence to support his conviction for actively participating in a criminal street gang in violation of section 186.22, subdivision (a). Specifically, defendant contends the People did not introduce substantial evidence that he was an active member of a gang in May 2012 or that he willfully promoted the felonious conduct of gang members because (1) the gang expert's testimony was not based on personal knowledge and was therefore unreliable, and (2) he

11

introduced substantial evidence that he was no longer an active gang member when he stole from the Target stores. We disagree and affirm defendant's conviction.

Our review of the evidence is governed by the well-settled substantial evidence test. "[W]e review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) The same analysis applies when the People rely mainly on circumstantial evidence. (*People v. Jones* (2013) 57 Cal.4th 899, 960-961.)

"The elements of the gang participation offense in section 186.22[, subdivision] (a) are: First, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang. [Citation.] A person who is not a member of a gang, but who actively participates in the gang, can be guilty of violating section 186.22[,

12

subdivision] (a). (§ 186.22, subd. (i).)" (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 (*Rodriguez*).) "Mere active and knowing participation in a criminal street gang is not a crime. Applying the third element of section 186.22[, subdivision] (a), a defendant may be convicted of the crime of gang participation only if he also willfully does an act that 'promotes, furthers, or assists in any felonious criminal conduct by members of that gang.' (§ 186.22[, subd.] (a).)" (*Id*. at pp. 1130-1131.)

A. Substantial Evidence of Defendant's Active Gang Membership in May 2012

The gang expert's testimony constituted substantial evidence that defendant was an active participant in the PPHG gang in May 2012. The expert based his opinion in part on his review of field investigation cards, which stated that on several occasions defendant and his two confederates admitted to police that they were members of the gang, and from his review of photographs showing the three men's respective tattoos. In fact, the officer testified that defendant's "PPHG" tattoo was the most significant fact for him because it signified that defendant was loyal to the gang and had put in the work necessary to stay a member of the gang in good standing. Moreover, the officer testified that often former gang members either have their gang tattoos removed or have a black line tattooed over them, and the clear implication was that defendant's tattoos had not been removed or covered up. Besides defendant's admissions to gang membership made to officers in the field, the expert testified that when defendant was booked into the county jail in the current case, he identified himself as a member of the PPHG and testified to the significance of that identification.

The expert also based his opinion on defendant's association with other admitted members of the PPHG. He testified the PPHG had numerous members who were related by blood, and that its members were "real close" to each other. In his opinion, that defendant spent time with and participated in the three burglaries with his brother and first cousin, both of whom the expert testified were documented members of the PPHG, helped establish that defendant was also an active member of the gang. Moreover, the officer testified that in March 2012, defendant attended the funeral of a member of the gang who was killed by police and was photographed with other members of the PPHG, including his brother, his cousin, and "Spicy Low," a founding member of the gang. The expert testified that only active members, who were in good standing, would have been permitted to attend such a funeral.

Finally, the expert based his opinion on the types of crimes defendant committed. He testified that in October 2004, defendant was convicted of being a felon in possession of a firearm, which the expert identified as a "primary activity" of the gang. Likewise, the expert testified that the three Target store burglaries constituted defendant "putting in work" for the gang, which would help elevate defendant's status in the gang because the ill-gotten gains might be used to purchase guns or illegal narcotics for resale.

Defendant contends the evidence we just recited is insufficient to sustain his conviction because the expert's testimony was unreliable and because defendant presented contrary evidence to the effect that he was no longer an active member of the gang when he stole from the Target stores, and that he stole the video games to pay for family necessities and not to benefit the gang. Neither argument persuades us.

14

i.      *Reliability of Gang Expert's Testimony*

With respect to the gang expert's opinion that defendant and his confederates were active gang members, defendant contends that testimony is unreliable because the officer "had no personal contact" with either of them and he only gleaned his information about them from police reports, field investigation cards, and photographs prepared by other officers.[3]  But personal knowledge is not required for introduction of expert witness testimony.  (See, e.g., *People v. Vang* (2011) 52 Cal.4th 1038, 1048 [although gang expert witness was not at the scene of the crime and "had no personal knowledge whether any of the defendants assaulted [the victim] and, if so, how or why," the "jury was as competent as the expert to weigh the evidence and determine what the facts were, including whether the defendants committed the assault"].)

"Evidence Code section 801 limits expert opinion testimony to an opinion that is '[b]ased on matter . . . perceived by or personally known to the witness *or made known to [the witness] at or before the hearing*, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the expert] testimony relates . . . .'  (*Id*., at subd. (b).)"  (*People v. Gardeley* (1996) 14 Cal.4th 605, 617, italics added.)  Defendant does not, and could not, dispute that the sources from which the expert gleaned his information were the type that a gang

---

[3]  In his opening brief, defendant also appears to contend the expert witness's testimony is unreliable because he first became acquainted with the PPHG in 2012.  To the contrary, the officer testified he first became acquainted with the PPHG when he was a patrol officer, some years before he became a gang investigator.

expert may reasonably rely upon. (*People v. Williams* (2009) 170 Cal.App.4th 587, 622 (*Williams*) [Fourth Dist., Div. Two] ["Gang experts may rely on their own investigations and information obtained from other law enforcement officers, including information from police reports, in forming their opinions"].)

    ii.    *Contrary Defense Evidence*

  Turning to defendant's contrary evidence to rebut each of the bases of the expert's opinion, that is an argument about the weight to be given to the expert's testimony and about which witness or witnesses should be believed, matters which are soundly left to the trier of fact. (*Albillar*, *supra*, 51 Cal.4th at p. 60.) For instance, defendant contends the fact that he self-identified with the PPHG during his jail classification interview is not reliable evidence that he was an active member of the gang at the time because, from his own testimony, a reasonable jury could conclude defendant choose to be housed with his old gang rather than in the general population or in protective custody for his personal safety. This argument clearly goes to the weight to be given by the jury to the expert's and to defendant's testimony. (*Williams*, *supra*, 170 Cal.App.4th at p. 623.)

  We noted in *Williams* that "'the sufficiency of the evidence showing active participation is not altered by the existence of other evidence offered by defendant to show he was not an active participant in the gang. Resolution of conflicting evidence and credibility issues was for the jury to decide. [Citation.] It is clear from the verdict finding defendant guilty of street terrorism that the jury believed he was actively participating in the gang. Because substantial evidence supports this determination, "'that the circumstances might also reasonably be reconciled with a contrary finding does

16

not warrant a reversal of the judgment.'"'"" (*Williams*, *supra*, 170 Cal.App.4th at p. 626, quoting *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1331.)

B. Substantial Evidence That Defendant Willfully Furthered, Promoted, Or Assisted in Felonious Conduct by Members of the Gang

The record also contains substantial evidence that defendant willfully furthered, promoted, or assisted in the felonious conduct of the PPHG members. As already stated, the expert testified that in his opinion, defendant's participation in the three Target store burglaries constituted defendant doing work for the gang, which benefited the gang because the proceeds from the burglaries might be used to buy guns or drugs.

As with the element of active membership in the gang, defendant's argument that the record contains contrary evidence to establish he did not further, promote, or assist in the gang's felonious conduct, goes to the weight and credibility of the evidence and must be rejected.

II

SUBSTANTIAL EVIDENCE SUPPORTS THE TRUE FINDING THAT DEFENDANT ACTED IN ASSOCIATION WITH GANG MEMBERS AND WITH THE SPECIFIC INTENT TO PROMOTE, FURTHER, OR ASSIST IN ANY CRIMINAL CONDUCT BY THE GANG'S MEMBERS

Defendant also challenges the sufficiency of the evidence to support imposition of a sentence enhancement under section 186.22, subdivision (b)(1)(A). As he does in relation to his substantive gang conviction, defendant contends the People did not introduce substantial evidence that he acted in association with a criminal street gang in

17

May 2012 because (1) the gang expert's testimony was not based on personal knowledge and was therefore unreliable, and (2) he presented substantial evidence that at the time of the Target store burglaries he was no longer an active member of the gang. Defendant also argues the People did not introduce substantial evidence that he had the specific intent to promote, further, or assist in the gang's criminal conduct because the Target store burglaries were not gang related. We conclude otherwise and affirm the imposition of the gang enhancement.

"Section 186.22[, subdivision] (b)(1) imposes additional penalties for 'any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . .' Unlike the substantive offense, the enhancement does not require proof of participation in a gang. It is further distinguished from the substantive offense by applying only to gang-related offenses and by requiring the defendant to act with the *specific intent* to promote, further, or assist any criminal conduct by gang members." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1130, fn. 5.)

A. Substantial Evidence That Defendant Acted in Association with Members of the Gang in May 2012

Defendant does not dispute that he participated in the Target store burglaries with his brother and cousin. The record contains substantial evidence from which the jury could conclude that defendant and his two confederates were active members of the PPHG at the time of the burglaries, so the jury could have reasonably drawn the additional inference that defendant's participation in the burglaries was in association

18

with the gang's members.  This evidence supports the gang expert's testimony that he was of the opinion the burglaries were done by defendant in association with the gang's members.

Defendant's arguments on this element, that the expert's opinion that defendant and his confederates were active gang members is unreliable and that defendant presented contrary evidence, have already been rejected.

B.  Substantial Evidence That Defendant Acted with the Specific Intent to Promote, Further, Or Assist in Criminal Conduct by Members of the Gang

With respect to the second element for the enhancement, the expert testified the Target store burglaries were not necessarily done for the financial benefit of the gang. Nevertheless, his testimony and the testimony about the burglaries themselves is substantial evidence that, when defendant committed the burglaries in association with active members of the PPHG, he did so with the specific intent to promote, further, or assist in that criminal conduct—by actually entering the Target stores and stealing merchandise.

Defendant argues the second element has not been sufficiently established because the People introduced no evidence that the burglaries were "gang related" and committed for the benefit of the gang.  We disagree.  Criminal conduct is "gang related," and is subject to enhanced punishment under section 186.22, subdivision (b)(1), if the defendant acted in association with the gang and acted to promote its criminal *conduct*.  (*Albillar*, *supra*, 51 Cal.4th at p. 60.)  The defendant need not have specifically intended to promote or benefit the gang itself.  (*Id*. at p. 67.)  Therefore, even if the jury credited defendant's

19

testimony that he planned on using the proceeds from the burglaries to buy diapers and other necessities it could still reasonably conclude that defendant had the specific intent to advance the criminal conduct of his fellow gang members.

And even if defendant were correct that the crimes must be "gang related," his arguments about the sufficiency of the evidence, like those made about the substantive crime of active participation in a criminal street gang, go to the weight to be given to the evidence. For example, defendant contends the fact that he and his confederates stole from Target stores in Los Angeles and Riverside Counties, instead of on the PPHG's home turf of San Bernardino, is further evidence that the crimes were not gang related. That a reasonable jury might draw such an inference does not diminish the fact that defendant's jury reasonably drew the contrary inference. (*Williams*, *supra*, 170 Cal.App.4th at p. 626.)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                            J.

We concur:


RAMIREZ
            P. J.


HOLLENHORST
            J.

20